

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-12-1994

# Beaser East, Inc. v. Mead Corp.

Precedential or Non-Precedential:

Docket 93-3372

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Beaser East, Inc. v. Mead Corp." (1994). *1994 Decisions*. Paper 130.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/130

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 93-3372
_____


BEAZER EAST, INC.,
Appellant

v.

THE MEAD CORPORATION,
Appellee

_____

Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 91-00408)

_____


Argued:  February 15, 1994


PRESENT:  BECKER, HUTCHINSON and COWEN, <u>Circuit Judges</u>


(Filed  September 12, 1994)

_____


George E. Yokitis, Esquire
Kenneth R. Bruce, Esquire
Albert Bates, Jr., IV, Esquire
Dean A. Calland, Esquire            (Argued)
Babst, Calland, Clements & Zomnir, P.C.
8th Floor
Two Gateway Center
Pittsburgh, PA     15222

        and

Billie S. Flaherty, Esquire
Beazer East, Inc.
436 Seventh Avenue
Pittsburgh, PA     15219

and

Robert L. Schuftan, Esquire
Wildman, Harrold, Allen & Dixon
225 West Wacker Drive
Chicago, IL      60606
          Attorneys for Appellant

Alan M. Wiseman, Esquire              (Argued)
Thomas A. Isaacson, Esquire
Howrey & Simon
1299 Pennsylvania Avenue, N.W.
Washington, DC      20004-2402

          and

George P. Faines, Esquire
John H. Bingler, Jr., Esquire
Thorp, Reed & Armstrong
One Riverfront Center
Pittsburgh, PA      15222
          Attorneys for Appellee

_____

OPINION OF THE COURT
_____


HUTCHINSON, <u>Circuit Judge</u>.


        Appellant, Beazer East, Inc. ("Beazer"), appeals an order of the United States District Court for the Western District of Pennsylvania dismissing Beazer's claims for indemnity and contribution.  Beazer claimed appellee, The Mead Corporation ("Mead"), was bound by a promise to pay Beazer all or part of Beazer's response costs on a Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C.A. § 9601-9675 (West 1983 & Supp. 1994) ("CERCLA"), cleanup of a site Beazer's predecessor had acquired from Mead's predecessor.  Instead, the

district court granted summary judgment to Mead on Mead's counterclaim for indemnity from Beazer against Mead's response costs. In doing so, the district court adopted a United States Magistrate Judge's report and recommendation ("Magistrate Judge's Report"). The magistrate judge had concluded that Mead was a responsible party for purposes of CERCLA but that the asset purchase agreement ("Agreement") under which Beazer had acquired the site of the contaminated facility, the Woodward Facility Coke Plant (the "Woodward Facility" or "Coke Plant"), required Beazer to indemnify Mead against CERCLA liability. The magistrate judge reasoned that a provision for indemnification in a contract that predates CERCLA's enactment will govern the responsibility of the contracting parties inter se for payment of CERCLA cleanup costs if the indemnification or release provision is a general release from all liability arising out of a particular transfer or contains an unambiguous promise to indemnify against all liabilities that environmental law, present or future, may impose because of pollutants on the property transferred. The magistrate judge then concluded that the asset purchase agreement between Mead's predecessor, the seller, and Beazer's predecessor, the buyer of the contaminated site, unambiguously required Beazer to indemnify Mead against any liability for injury to the environment from substances on the property, including cleanup under CERCLA, no matter who polluted the site. The paragraph in question, Paragraph 4(c) of the agreement, required the buyer and its successors to assume and perform "[o]bligations of the Coke Plant to comply from and after the Closing Date with all of the

terms and conditions of any . . . solid waste disposal permit, license or order, hereafter issued by the United States Environmental Protection Agency . . . in accordance with applications now pending and listed in Exhibit F hereto." Appellant's Appendix ("App.") at 23.

On appeal Beazer argues that the district court erred in concluding this indemnity provision was unambiguously broad enough to impose on it a general duty to indemnify Mead against all environmental liability under either state or federal common law concerning the construction of such contracts of indemnity.

We agree with the magistrate judge and the district court concerning the substance if not the source of the standard that must be used in determining the effect of an indemnity clause on a party's liability under laws subsequently enacted to protect the environment. We part ways with the magistrate judge and the district court, however, in the application of this standard to the provision at hand. We agree with Beazer that Paragraph 4(c) of this agreement does not plainly and unambiguously require it to indemnify Mead for cleanup costs at the Coke Plant, and therefore reverse the order of the district court granting Mead summary judgment, vacate the order which dismisses Beazer's claim for contribution and remand for further proceedings consistent with this opinion. On remand the district court will have to consider both parties' contribution claims, and determine the proper apportionment of CERCLA liability.

I. Factual & Procedural History

Mead's predecessor, the Woodward Corporation, operated the Woodward Facility as a coke and coke-by products manufacturing facility from 1905 until 1968. In 1968, the Woodward Iron Company merged with Mead. Mead, in turn, operated the Coke Plant until 1974, when it sold the facility and surrounding land to Beazer's predecessor, Koppers Company, Inc. ("KCI"). KCI purchased the Coke Plant under the Agreement in question. Paragraph 4 of the Agreement provides that KCI, as buyer, or its successors, will assume certain agreements and liabilities. It reads:

> As of the Closing Date, Buyer shall assume and agree to perform:
>
> a. . . . all other commitments, liabilities and obligations expressly assumed by Buyer pursuant to this Purchase Agreement.
>
> \* \* \*
>
> c. Obligations of the Coke Plant to comply from and after the Closing Date with all of the terms and conditions of any NPDES permit issued by the United States Environmental Protection Agency or the then permitting authority, any permit or order issued by the Alabama Water Improvement Commission and the Alabama Air Pollution Control Commission of the State of Alabama or any successor authority, any license, permit or order issued by the Jefferson County Department of Health, and of any other wastewater or runoff water discharge permit, license or order, air pollution permit, license or order, solid waste disposal permit, license or order, hereafter issued by the United States Environmental Protection Agency and/or by the State of Alabama and/or any of its political subdivisions, all in accordance with applications now pending and listed on Exhibit F hereto.

App. at 22-23.  Exhibit F contains a "List of Environmental Applications and Permits."  It is divided into two parts, one for permits related to air and one for permits related to water. Exhibit F lists no permits related to solid waste.  All the listed permits refer to their date of issuance and the issuing authority.

Paragraph 8(a) of the Agreement requires Mead, the seller, to indemnify Beazer, the buyer, against certain other liabilities.  It provides:

> a.  Indemnity Against Unassumed Liabilities.  Mead hereby indemnifies Buyer against and hereby agrees to hold Buyer harmless from and to reimburse Buyer for any and all liabilities, losses, damages, costs of settlement and expenses . . . which may be imposed upon or incurred by Buyer in connection with any liabilities or obligations of Mead other than those expressly assumed by Buyer.

App. at 29.

Paragraph 8(b), on the other hand, requires Beazer, as the buyer's successor, to indemnify Mead, as seller's successor, against other liabilities, including whatever liabilities paragraph 4(c) imposes on the buyer.  It reads:

> b.  Indemnity Against Assumed Liabilities.  Buyer hereby indemnifies Mead against and hereby agrees to hold Mead harmless from and to reimburse Mead for any and all liabilities, losses, damages, costs of settlement and expenses . . . which may be imposed upon or incurred by Mead in connection with any liabilities or obligations of Mead and/or the Coke Plant assumed by Buyer under this Purchase Agreement.

App. at 30.

In 1977, KCI transferred the Coke Plant and surrounding land to the Industrial Development Board of the City of Fairfield, Alabama ("IDB").  In turn, IDB leased the premises back to KCI.  KCI continued to operate the facility.  In 1988, Beazer acquired KCI and transferred the lease to a newly created corporation, Koppers Industries, Inc. ("KII").  At about this same time IDB transferred its ownership interest in the Coke Plant and the surrounding land back to KII.

In 1981, the United States Environmental Protection Agency ("EPA") and the Alabama Department of Environmental Management began to investigate the Coke Plant site for toxic substances.  As a result, EPA asked Beazer to sign an Administrative Order on Consent (the "Order") that would require Beazer to do a site-wide environmental investigation and eventually cleanup the site.  On June 21, 1991, Beazer signed the Order.  Issued pursuant to the Solid Waste Disposal Act, it identifies thirty-nine problem areas at the Coke Plant.  The Order calls each of them a "solid waste management unit."  Beazer agreed to test each of these units for the presence of toxic wastes and then clean them up as necessary.

On March 6, 1991, Beazer filed this action.  The complaint, following amendment and dismissal of several counts, claimed contribution from Mead against any response costs Beazer incurred under CERCLA, 42 U.S.C.A. §§ 9607(a), 9613(f), or

indemnification from Mead based on Paragraph 8(a) of the Agreement. Under the Agreement's indemnification provisions, Beazer claimed that the expense of investigating the toxicity of these areas and cleaning them up was ultimately Mead's responsibility. Beazer also alleged that many of the solid waste management units it agreed to cleanup are parts of the site that Mead had dedicated to waste management but Beazer had never utilized while it was operating the facility.

Mead denied any obligation either to indemnify Beazer against these costs or to contribute to the cost of testing, investigating or cleaning up the site. It also asserted a counterclaim under Paragraph 4(c) of the Agreement demanding that KCI and Beazer, as KCI's successor in interest, indemnify Mead, hold it harmless and reimburse it for all response costs that investigation and cleanup of toxic wastes deposited on or in the Coke Plant or its environs may require. In another counterclaim, Mead asserted, in the alternative, a right to contribution from Beazer for any CERCLA costs Mead might be required to pay.

Beazer filed a motion for a partial summary judgment seeking a declaration that Mead was a responsible operator under sections 107(a) and 113(f) of CERCLA, and that Paragraph 8(a) of the Agreement required Mead to indemnify Beazer against liability for all response costs. Mead filed a cross-motion for summary judgment asserting that Paragraph 4(c) of the Agreement relieved it of any obligation to indemnify Beazer or contribute to any cleanup costs Beazer might incur, and that Paragraphs 4(c)

and 8(b) combined to obligate Beazer to indemnify Mead against any CERCLA response costs Mead might incur.

The magistrate judge to whom the district court had referred these motions issued a report recommending that Mead be held liable as a "responsible party" for any government paid response costs, that Mead's cross-motion for summary judgment against Beazer be granted and that Beazer's action be dismissed in its entirety. Beazer filed timely objections, but the district court adopted the Magistrate's Report as its opinion, granted Mead's cross-motion for summary judgment and dismissed all of Beazer's claims. Beazer filed this timely appeal.

## II. Jurisdiction & Standard of Review

The district court had subject matter jurisdiction over this case under 28 U.S.C.A. §§ 1331, 1332, 1367 (West 1993) and 42 U.S.C.A. § 9613(b) (West Supp. 1993). We have appellate jurisdiction over the district court's final order dismissing Beazer's claims and granting Mead's counterclaim under 28 U.S.C.A. § 1291 (West 1993).

We exercise plenary review over a district court's grant of summary judgment. Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there remain any genuine issues of material fact and, if not, whether the moving party is entitled to judgment as a matter of law. See Bank of Nova Scotia v. Equitable Fin. Management, Inc., 882 F.2d 81, 83 (3d Cir. 1989).


## III. Analysis

> Section 9607(e)(1) of CERCLA provides:
> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C.A. § 9607(e)(1) (West 1983). On first reading, this appears internally inconsistent. We have reconciled its two sentences by construing them to mean "agreements to indemnify or

hold harmless are enforceable between the parties but not against the government." Smith Land & Improvement Corp. v. Celotex Corp., 851 F.2d 86, 89 (3d Cir. 1988), cert. denied, 488 U.S 1029 (1989); see also United States v. Hardage, 985 F.2d 1427, 1433 (10th Cir. 1993) (Under section 9607(e)(1) "responsible parties may not altogether transfer their CERCLA liability, [but] they have the right to obtain indemnification for that liability.") (citations omitted) (emphasis in original). As the district court recognized in Hatco Corp. v. W.R. Grace & Co.--Conn., 801 F. Supp. 1309 (D.N.J. 1992):

> Because § 9607(e)(1) renders ineffective any attempt to completely "transfer" liability, the most a party can do to limit its liability under CERCLA is to obtain from another an agreement "to insure, hold harmless, or indemnify" it from any liabilities established against it.

Id. at 1317 (quoting 42 U.S.C.A. § 9607(e)(1)).

Thus, Beazer could have lawfully agreed to indemnify Mead for its CERCLA liability or, conversely, Mead could have lawfully agreed to indemnify Beazer. The issue is whether either did so. The Agreement the parties rely on was executed before CERCLA was enacted. Therefore, we must, at the outset, resolve the preliminary issue of whether a contract of indemnity that predates CERCLA can be construed to include indemnity against CERCLA liability. This is a question of first impression in this Court.

Other courts that have analyzed pre-CERCLA indemnity provisions have uniformly held that a pre-CERCLA agreement can

require one party to indemnify another against CERCLA liability. See, e.g., Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 327 (7th Cir. 1994); Hatco Corp., 801 F. Supp. at 1317-18; Purolator Prods. Corp. v. Allied-Signal, Inc., 772 F. Supp. 124, 132 (W.D.N.Y. 1991); Mobay Corp. v. Allied-Signal, Inc., 761 F. Supp. 345, 356-58 (D.N.J. 1991). We find the reasoning of these courts persuasive. Accordingly, we hold that a pre-CERCLA agreement can require an indemnitor to hold the indemnitee harmless from CERCLA liability.

Nevertheless, not all pre-CERCLA promises to indemnify cover CERCLA liability. We must look to see whether an indemnification provision is either specific enough to include CERCLA liability or general enough to include any and all environmental liability which would, naturally, include subsequent CERCLA claims. The first step in this inquiry is to determine what law applies to the construction or interpretation of contractual provisions that affect responsibilities Congress has imposed on us in statutes enacted to enforce this nation's strong commitment to a clean, safe and attractive environment. We now turn to this issue, also one of first impression in this Court.

A.

In deciding what law to apply to determine whether Paragraphs 4(c) and 8(a) establish an obligation for Beazer to indemnify Mead against CERCLA liability or Mead to indemnify Beazer, the magistrate judge looked first to the law the parties

chose in Paragraph 13(k)(1) of the Agreement.  It provides that Alabama law will govern.[1]  Seeing "no reason to frustrate the obvious and expressed intent of the parties," the magistrate judge said he would apply Alabama law to decide whether the Agreement's indemnity provisions were clear enough to require Beazer to hold Mead harmless against CERCLA liability at the site.  Magistrate Judge's Report at 9.

Finding no Alabama law directly on point, the magistrate judge took a cue from the holdings of the United States District Court for the District of New Jersey that pre-CERCLA agreements may cover CERCLA liability if such agreements are "worded broadly enough to encompass any and all liabilities, or if environmental liability is clearly referred to in the agreement."  Id. at 9-10 (citing Hatco Corp., 801 F. Supp. at 1318; Purolator Prods. Corp., 772 F. Supp. at 132; Mobay Corp., 761 F. Supp. at 356; Southland Corp. v. Ashland Oil Inc., 696 F. Supp. 994 (D.N.J. 1988)).  After concluding that Alabama law on the meaning of contracts was not inconsistent with this developing standard of federal common law, the magistrate judge saw no impediment to interpreting the Agreement under Alabama contract law.  Nevertheless, he pointed out that construction or interpretation of a pre-CERCLA indemnity clause's effect on CERCLA liability might "be an issue best determined by a uniform

---

[1].  The paragraph states, "Each of the parties elects that this Purchase Agreement shall be governed, construed and enforced in accordance with the laws of the State of Alabama."  App. at 44-45.

federal rule . . . and that the federal case law establishing the standard under CERCLA may override any inconsistent state law in this respect."  Id. at 10 n.2.

The first question that we should ask is whether the national interest in uniform application of federal statutory law requires federal courts to develop a federal common law to preclude willy-nilly use of various state law principles in interpreting or construing indemnification provisions that affect liabilities under CERCLA.  Cf. O'Melveny & Myers v. Federal Deposit Insurance Corp., 114 S. Ct. 2048, 2052-55 (1994).

Generally, federal law governs the validity of an agreement releasing a cause of action arising under federal law; see Dice v. Akron, Canton & Youngstown R.R. Co., 342 U.S. 359, 361 (1952), but the construction or interpretation of a private contract is generally thought to be a question of state law. Accordingly, most courts have recognized that imposition of CERCLA liability on a successor corporation is a question of federal law.  See, e.g., John S. Boyd, Co. v. Boston Gas. Co., 992 F.2d 401, 406 (1st Cir. 1993); Mardan Corp. v. C.G.C. Music, Ltd., 804 F.2d 1454, 1457 (9th Cir. 1986); HRW Sys., Inc. v. Washington Gas Light Co., 823 F. Supp. 318 326-28 (D. Md. 1993); Chesapeake & Potomac Tel. Co. v. Peck Iron & Metal Co., 814 F. Supp. 1266, 1267-68 (E.D. Va. 1992).

Nevertheless, all of the courts of appeals that have considered developing a federal rule of decision appear to have decided it is better to look to state law in interpreting or

construing a contract's indemnification provisions vis-á-vis CERCLA.[2]

In John S. Boyd Co., the United States Court of Appeals for the First Circuit looked to the Massachusetts law of contracts to apportion CERCLA liability among contracting parties inter se. In construing the parties' written agreement, it said, "state contract law . . . provide[s] the substantive rule, so long as it is not hostile to the federal interests animating CERCLA." John S. Boyd Co., 992 F.2d at 406 (citations omitted); Hardage, 985 F.2d at 1433 n.2 ("Because the government's interests are unaffected by the allocation of liability between jointly and severally liable parties, we easily conclude that a uniform federal rule is unnecessary and that state law will govern the indemnification clauses."); see also O'Melveny, 114 S. Ct. at 2055 ("Our cases uniformly require the existence of [a

---

[2]. See John S. Boyd Co., 992 F.2d at 406 (incorporating state law into federal law to construe an agreement pertaining to CERCLA liability); Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 15 (2d Cir. 1993) (state law supplies the principles that govern the construction or interpretation of indemnification clause applicable to CERCLA liability); Hardage, 985 F.2d at 1433 & n.2; Mardan Corp., 804 F.2d at 1458, 1460 (holding that federal courts should look to applicable state law to decide the validity of releases of claims under CERCLA); see also City of Phoenix, Az. v. Garbage Servs. Co., 827 F. Supp. 600, 602-03 (D. Ariz. 1993) ("When developing federal common law, the court must decide whether to fashion a nationally uniform federal rule, or incorporate state law as the federal rule of decision. . . . The Ninth Circuit Court of Appeals has taken both approaches when filling in the gaps left by CERCLA, depending on the context.") (citations omitted); cf. HRW Sys. Inc., 823 F. Supp. at 328 (adopting federal "continuity of enterprise test endorsed by Fourth Circuit rather than state law to determination of corporate successor liability); Chesapeake & Potomac Tel., 814 F. Supp. at 1268 (same).

significant conflict between some federal policy or interest and the use of state law] as a precondition for recognition of a federal rule of decision.").

The United States Court of Appeals for the Ninth Circuit has analyzed the issue of choosing state or federal common law to determine whether private indemnification agreements cover CERCLA liability in depth.  See Mardan Corp., 804 F.2d at 1458-60.  In Mardan Corp., the government, in an amicus brief, argued for state law to provide the substance of the decision rule.  It said that "whether and when agreements between private 'responsible parties' can settle disputes over contribution rights under [CERCLA]" did not require the development of a uniform federal rule.  Id. at 1458.  The court of appeals stated:

> [S]ection [9607(e)(1)] expressly preserves agreements to insure, to hold harmless, or to indemnify a party held liable under [CERCLA]. Absent CERCLA, these contracts would be interpreted under state law.  By preserving such agreements, Congress seems to have expressed an intent to preserve the associated body of state law under which agreements between private parties would normally be interpreted.  Certainly federal courts need not fashion federal common law to interpret every settlement of liability that arises under federal statutes.

Id.

Because Congress's intent to require a federal rule of decision was "not entirely clear," the court of appeals considered whether the policies Congress sought to advance by

enacting CERCLA required a uniform federal standard for the interpretation and construction of indemnity clauses.  For guidance it looked to the Supreme Court's opinion in United States v. Kimbell Foods, Inc., 440 U.S. 715 (1979).  Id.  Kimbell Foods set out the factors courts should use to determine when a uniform federal rule is needed to decide federal claims based on federal statutes when Congress has not made clear its intent on what law should supply a rule of decision.  See Kimbell Foods, 440 U.S. at 728-29.  They are:

> (1) whether the issue requires "a nationally uniform body of law"; (2) "whether application of state law would frustrate specific objectives of the federal programs"; and (3) whether "application of a federal rule would disrupt commercial relationships predicated on state law."

Mardan Corp., 804 F.2d at 1458 (citing Kimbell Foods, 440 U.S. at 728-29).  The court of appeals in Mardan Corp. applied Kimbell Foods and concluded there was no need for a federal common law standard.  It stated:

> First, we find no reason to think that the issue requires a uniform body of law. Commercial enterprises selling their assets or insuring themselves will normally look to state law to interpret their indemnification provisions, which will generally indemnify the enterprises against a whole host of possible liabilities.  Disuniformity does not seem to impose any particular burden. . . .
>
> Second, the application of state law to interpret such releases will not frustrate the objectives of CERCLA.  Contractual arrangements apportioning CERCLA liabilities between private "responsible parties" are essentially tangential to the enforcement of CERCLA's liability provisions.  Such

> agreements cannot alter or excuse the
> underlying liability, but can only change who
> ultimately pays that liability. . . .
>
>                      \*    \*    \*
>
>      Finally, we are convinced that
> application of a federal rule . . . would
> disrupt commercial relationships predicated
> on state law. . . .  Creating a federal rule
> to govern CERCLA releases would introduce
> confusion and uncertainty into these
> commercial relationships in two respects.
> One, buyers and sellers would face greater
> confusion about which body of law to turn to.
> Two, the creation of a federal rule, as
> opposed to incorporating a ready-made and
> fully fleshed out body of state law, would,
> during the development of that federal rule,
> leave parties very uncertain about what rule
> governed CERCLA releases. . . .

Id. at 1458-60.

     Judge Reinhardt, in a dissent in Mardan Corp., thought that a uniform federal rule should be applied to determine whether any particular agreement indemnified against CERCLA liability.  Mardan Corp., 804 F.2d at 1463 (Reinhardt, J. dissenting).  Citing cases that adopted uniform federal rules to determine liability under section 9607 and the legislative history of that section stressing the need for "'a uniform rule of law . . . to discourage business[es] dealing in hazardous substances from locating primarily in states with more lenient laws,'" Judge Reinhardt reasoned that "a uniform federal rule regarding releases from CERCLA liability serves Congress' goals in the same manner that a uniform rule regarding liability does." Id. at 1464 (citing 5 U.S.C.C.A.N. 6119, 6119-20, 6132 (1980) and

quoting 126 Cong. Rec. H11787 (daily ed. Dec. 3, 1980) (statement of Representative Florio, CERCLA House sponsor) (alteration in original)).  But see id. at 1459-60 (majority opinion) (arguing that parties are still fully liable to the government regardless of applicable law and concluding that adoption of state law does not conflict with congressional purpose underlying CERCLA).

Though this Court has yet to consider what law should govern the construction or interpretation of any particular indemnity provision on the apportionment of CERCLA liability among contracting parties, we have adopted a federal common law standard in other environmental contexts.[3]  In Smith Land & Improvement Corp. v. Celotex Corp., we stressed the need for uniform standards if CERCLA is to be effective and indicated that a district court considering successor liability under CERCLA should look to "[t]he general doctrine of successor liability in operation in most states . . . rather than the excessively narrow statutes which might apply in only a few states."  Smith Land & Improvement Corp., 851 F.2d at 92.  We reasoned if we refused to apply uniform federal standards to regulate CERCLA liability, "CERCLA aims may be evaded easily by a responsible party's choice to arrange a merger or consolidation under the laws of particular states which unduly restrict successor liability."  Id.  In Lansford-Coaldale Water Authority v. Tonolli Corp., 4 F.3d 1209

_____

[3]. It is perhaps material to note that these standards do not spring full formed and grown from the heads of federal judges as Athena did from Zeus nor does any Delphic oracle whisper uniformly in each judge's ear.  See Manfred Lurker, Dictionary of Gods & Goddesses, Devils & Demons 44-45 (1987)

(3d Cir. 1993), we also expressed a preference for uniform federal standards to govern CERCLA liability. We held that "given the federal interest in uniformity in the application of CERCLA, it is federal common law, and not state law, which governs when corporate veil-piercing is justified under CERCLA." Id. at 1225 (citations omitted).

None of our cases, however, deal with the need for a federal standard in interpreting or construing contracts to indemnify and our sister courts of appeals have uniformly selected state law. See supra note 2. Fortunately we see no need to create a circuit conflict and will join the other courts of appeals that look to the law of a particular state concerning the construction or interpretation of contracts of indemnity to determine whether a particular indemnification provision covers CERCLA liability. We thus endorse the majority's reasoning and application of the Kimbell Foods test in Mardan Corp.

Moreover, we see support for this principle in the Supreme Court's recent decision in O'Melveny & Myers. It teaches us that special federal rules are justified only in "situations where there is a 'significant conflict between some federal policy or interest and the use of state law.'" O'Melveny & Myers, 114 S. Ct. at 2055 (quoting Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 68 (1966)).

In O'Melveny & Myers, the Supreme Court considered whether federal or state decisional law should govern the question of imputation of knowledge in a suit where the FDIC sued in its capacity as receiver for a federally insured bank that had

failed. The FDIC argued that <u>Kimbell Foods</u> required the district court to apply a uniform federal rule of decision to determine FDIC's rights because "federal law governs questions involving the rights of the United States under nationwide federal programs." <u>O'Melveny & Myers</u>, 114 S. Ct. at 2053 (quoting <u>Kimbell Foods</u>, 440 U.S. at 726). The Supreme Court first stated, "[T]he FDIC is not the United States, and even if it were we would be begging the question to assume that it was asserting its <u>own</u> rights rather than, as receiver, the rights of [the failed bank.]" <u>Id.</u> (emphasis added). It went on to note, "The rules of decision at issue here do not govern the primary conduct of the United States or any of its agents or contractors, but affect only the FDIC's rights and liabilities, as receiver, with respect to primary conduct on the part of <u>private</u> <u>actors</u> that has already occurred." <u>Id.</u> at 3055 (emphasis added). The Supreme Court then held that the issue of imputed knowledge in bank receivership cases "is not one of those extraordinary cases in which the judicial creation of a federal rule of decision is warranted." <u>Id.</u> at 2056.

How Beazer and Mead apportion their CERCLA liability among themselves does not affect the primary duty they owe the United States to clean up the poisons left to befoul the site both used. Whether one must indemnify the other concerns instead the liability of private actors for acts already done, just as the liability of the alleged tortfeasor in <u>O'Melveny</u> involved the FDIC's right, as successor to the private right of an injured party, to recover for the injuries its predecessor had suffered

as a result of past acts.  How much Beazer or Mead pay each other seems to us to have even less effect on the United States than did the ability of FDIC to recover for tort injuries suffered by the failed bank it took over.  The interpretation and construction of Paragraph 4(c) has no impact on either party's liability to the government.  See Smith Land & Improvement Corp., 851 F.2d at 89.  On reason as well as authority, we therefore hold that state law should determine whether any particular contract of indemnity provision can be construed generally or broadly enough to cover one responsible party's liability to another.

B.

Having determined that state law on the interpretation and construction of indemnification agreements applies to this case, we turn to the question of what state law should be applied.  On that issue, we can quickly agree with the district court and apply Alabama law.[4]

_____

[4].  We again note the magistrate judge, despite his summary conclusion that Alabama law controls, seems to have applied the standard adopted by the United States District Court for the District of New Jersey.  That court has used a federal standard to conclude that an indemnification or release provision which affects a party's CERCLA liability must be:

> (1) a broad waiver of "all liabilities of any type whatsoever" . . . which would clearly evince the parties' broad intent to finally settle all present and future liability issues arising from the sale,; or (2) at a minimum, "must at least mention that one party is assuming [all] environmental-type liabilities" . . . which would clearly evince

We look to decisions of the Alabama courts and
especially those of the Supreme Court of Alabama.  Its most
recent decision concerning the interpretation or construction of
indemnification provisions is Nationwide Mutual Insurance Co. v.
Hall, Nos. 1921128 & 1921272, 1994 WL 107547 (Ala. April 1,
1994).  There, it held that indemnification agreements are
enforceable in Alabama if "'the parties knowingly, evenhandedly,
and for valid consideration, intelligently enter into an
agreement whereby one party agrees to indemnify against the
indemnitee's own wrongs, [and if that agreement is] expressed in
clear and unequivocal language."  Nationwide Mut. Ins. Co., 1994
WL 107547 at *3 (quoting Industrial Tile, Inc. v. Stewart, 388
So.2d 171, 175-76 (Ala. 1980), cert. denied, 449 U.S. 1081 (1981)
(alteration in original)).  In Nationwide, Alabama's supreme
court recognized that indemnity agreements covered only those
incidents within their plain meaning and the court expressed a
strong preference for this limitation.  Id. (quoting Craig
Constr. Co. v. Hendrix, 568 So.2d 752, 757 (Ala. 1990);
Industrial Tile, Inc., 388 So.2d at 176).  The supreme court then
stated that "an indemnity contract purporting to indemnify for
the consequences of the indemnitee's own negligence is

(..continued)
             the parties' intent to settle all issues
             related to present and future environmental
             liabilities.

Hatco Corp., 801 F. Supp. at 1317-18 (quoting and citing Mobay
Corp., 761 F. Supp. at 358 & n.15) (emphasis in original).  The
magistrate judge states, however, that he used this standard
because it is consistent with Alabama law.

unambiguous, and therefore, enforceable when its language specifically refers to the negligence of the indemnitee. . . . [but that] such 'talismanic' or thaumaturgic language is not necessary if the requisite intent is otherwise clear." Id. (citations omitted).[5]

We conclude that Alabama law requires a plain and unambiguous expression of intent to cover the cost of the liability in question. Using this standard, we now consider whether Paragraph 4(c) unambiguously expresses Beazer's intent to indemnify Mead against CERCLA liability.

C.

The crux of the parties' argument concerns the district court's conclusion that Beazer expressly and unambiguously agreed to indemnify Mead for its CERCLA liability.[6] They disagree as to whether the magistrate judge correctly applied Alabama's limiting standard to the Agreement. Paragraph 4(c) reads:

4. <u>Assumption of Agreements and Liabilities</u>

As of the Closing Date, Buyer [Beazer] shall assume and agree to perform:

\*   \*   \*

c.   Obligations of the Coke Plant to comply from and after the Closing Date with all

---

[5]. We do not think Alabama would apply a different rule in deciding whether an indemnity clause covers strict liability under environmental law.

[6]. Whether an agreement is unambiguous is a question of law. <u>McDonald v. U.S. Die Casting & Dev. Corp.</u>, 585 So. 2d 853, 855 (Ala. 1991).

of the terms and conditions of . . . any solid waste disposal permit, license or order, hereafter issued by the United States Environmental Protection Agency . . . all in accordance with applications now pending and listed on Exhibit F hereto.

App. at 23.[7]  Exhibit F is divided into two parts.  Beazer argues that Paragraph 4(c) limits its agreement to assume Mead's environmental liabilities to the permits mentioned in Exhibit F's "List of Environmental Applications and Permits."  Because neither part of Exhibit F mentions any solid waste permit, Beazer contends that Paragraph 4(c)'s promise to indemnify does not unambiguously cover CERCLA response costs incurred in removing any toxic wastes found in or around the Coke Plant.

After concluding that Paragraph 4(c) did not unambiguously rule out a promise to indemnify Mead against CERCLA

_____

[7].  Beazer's duty to indemnify is controlled by Paragraph 8(b) of the Agreement which provides:

Buyer [Beazer] hereby indemnifies Mead against and hereby agrees to hold Mead harmless from and to reimburse Mead for any and all liabilities, losses, damages, costs of settlement and expenses . . . which may be imposed upon or incurred by Mead in connection with any liabilities or obligations of Mead and/or the Coke Plant assumed by Buyer under this Purchase Agreement.

App. at 30.  The obligations imposed by Paragraph 4 constitute "liabilities or obligations . . . assumed by Buyer [Beazer] under this Purchase Agreement."  Id.  Thus, if Paragraph 4 encompasses CERCLA liability, Beazer would be required to indemnify Mead under Paragraph 8(b) of the Agreement.

liability, the magistrate judge went on to consider whether it unambiguously required Beazer to indemnify Mead for CERCLA liability under the federal standard announced in Mobay Corp. He acknowledged that Paragraph 4(c) was not a broad, general promise to indemnify Mead against all liability. Nevertheless, he concluded that the text of the paragraph

> clearly implies that, as between Beazer and Mead, Beazer would be responsible for any environmental liability arising from the Woodward Facility after the date of the sale. Even more than this implication regarding all environmental liability, the provision expressly provides that Beazer will be responsible for complying with orders issued by the EPA regarding solid waste.

Magistrate Judge's Report at 15. The magistrate judge construed Paragraph 4(c) as a promise by the buyer and its successors to indemnify the seller and its successors against all environmental liabilities associated with the Coke Plant.

In doing so, the magistrate judge decided that Paragraph 4(c)'s textual reference to future "orders" issued by state, local, and federal agencies contradicted the more restrictive interpretation of Paragraph 4(c) which Beazer would have us infer from the specific list of permits mentioned in Exhibit F Paragraph 4(c). If Paragraph 4(c) were confined to the permits listed in Exhibit F, the magistrate judge reasoned that Paragraph 4(c)'s reference to permits, licenses, and orders "hereafter issued" would be meaningless. Thus, he concluded that Paragraph 4(c) did include all subsequent orders, permits, and licenses relating to environmental liability including those

required or issued under CERCLA.  Accordingly, the magistrate judge made the recommendation the district court accepted in granting summary judgment to Mead and dismissing Beazer's claim for contribution under CERCLA.

Paragraph 4(c) does expressly make Beazer responsible for "solid waste . . . permits issued by [EPA]," but it has as additional limiting language; "all in accordance with applications now pending and listed on Exhibit F hereto." Therefore, Beazer contends that the magistrate judge erred when he concluded that Paragraph 4(c) clearly and unambiguously transferred Mead's CERCLA liability to Beazer.  Beazer first argues that Paragraph 4(c) is no more than a "window" provision, common in commercial agreements for the sale of assets, which gives a seller interim protection against a buyer's failure to comply with the conditions of any existing environmental permits that are specifically listed, as they are here in Exhibit F. Thus, Beazer argues that the magistrate judge erred when he failed to consider the parties' basic decision to structure the sale as a purchase of assets.  Beazer would have us infer that the decision to buy and sell assets was mutually agreed on for the express purpose of limiting the purchaser's liability.  We think Beazer's argument that purchasers under asset purchase agreements normally assume only those debts, obligations, and liabilities of the seller that are expressly identified in the agreement is plausible and that the district court's holding that Beazer must indemnify Mead would be inconsistent with that purpose.  Nevertheless, we have been unable to find any evidence

in this record that would unambiguously confirm that interpretation, and the text of Paragraph 4(c) is at least arguably to the contrary. Cf. Watts v. TI, Inc., 561 So.2d 1057, 1059-60 (Ala. 1990). Therefore, we conclude that Beazer's argument about the nature and purpose of framing a transfer of a business enterprise as a sale of assets begs the question on Paragraph 4(c)'s meaning.

Beazer's argument that the language of Paragraph 4(c) is not clear enough to transfer Mead's CERCLA liability to Beazer under Alabama law is more telling. We conclude Paragraph 4(c) is ambiguous under the principles of Alabama law that guides determinations of contracts. See Reeves Cedarhurst Dev. Corp. v. First Amfed Corp., 507 So. 2d 184, 186 (Ala. 1992) ("An instrument is unambiguous if only one reasonable meaning clearly emerges.") (quoting Vainrib v. Downey, 565 So. 2d 647, 648 (Ala. Civ. App. 1990). The provision is subject to more than one reasonable interpretation, and it is not plain enough to be construed as an unambiguous promise by Beazer to indemnify Mead against all environmental liability associated with the site of the Coke Plant, including liability without fault under laws like CERCLA, yet to be passed. Therefore, it does not square with the principle of Alabama law that promises to indemnify are limited to subjects plainly expressed.

Moreover, cases outside Alabama which have held a release or indemnification provision covers CERCLA liability have all involved indemnity clauses with much broader and more inclusive language than here. See, e.g., Kerr-McGee Chem. Corp.,

14 F.3d at 326-27; Olin Corp., 5 F.3d at 12-13; Hardage, 985 F.2d at 1434; Niecko v. Emro Mktg. Co., 973 F.2d 1296, 1300 (6th Cir. 1992); Mardan Corp., 804 F.2d at 1461-62.   The Olin Corp. case provides one recent example.[8]  The court of appeals held that

---

[8].  The sale agreement in Olin Corp. originally provided:

> [The buyer] hereby assumes and agrees to be responsible for and to pay, perform, discharge and indemnify [the seller] against, all liabilities (absolute or contingent), obligations and indebtedness of [the seller] related to the Aluminum Assets . . . as they exist on the Effective Time or arise thereafter with respect to actions or failures to act occurring prior to the Effective Time.

Olin Corp., 5 F.3d 12-13.  A later agreement in Olin Corp. stated:

> In consideration of the payment on this date by [the seller] to [the buyer] of $3,700,000 . . . [the buyer] hereby releases and settles all claims of any nature which [it] now has or hereafter could have against [the seller] . . . whether or not previously asserted, under or arising out of the Purchase Agreement . . ., or the transactions contemplated thereby.

Id. at 13 (footnote omitted).

   In the Kerr-McGee case the indemnification clause read:

> [The purchaser] expressly agrees to indemnify and to defend and hold [plaintiff's predecessor Moss-American], its officers, employees, and agents, free and harmless from and against any and all claims, damages, judgments, fines, penalties, assessments, losses, expenses, including interest, court costs and attorney fees, however the same may be caused, arising out of or resulting from, directly or indirectly, the following: (a) the purchase, dismantling or sale of the

this provision evidenced a "clear and unmistakable intent" to transfer the seller's environmental liability to the buyer, even future and unknown liability. <u>Olin Corp.</u>, 5 F.3d at 15-16.

> The court of appeals held:
> In no uncertain terms, [the purchaser] agreed to assume the liability for losses resulting from "the maintenance of any . . . claim . . . concerning pollution or nuisance . . . ." The indemnity provision covers all pollution and nuisance claims without limitation . . . . [and makes the purchaser] responsible for any liability imposed . . . under CERCLA.

<u>Id.</u> at 327 (footnote omitted).

The contradictory terms and references of this Agreement leave us with no firm conclusion as to the clear and unmistakable intent of the parties. Under applicable principles of Alabama law, the parties failed to express the intent to indemnify with the requisite clarity. We hold, therefore, that Paragraph 4(c) is not specific enough to impose on Beazer a duty to indemnify Mead for their CERCLA response costs.

(..continued)
> personal property and real property by [the purchaser]; (b) the maintenance of any action, claim or **order concerning pollution** or nuisance; and (c) the use by [the purchaser] or its employees or agents of the personal property and real property.

<u>Kerr-McGee Chem. Corp.</u>, 14 F.3d at 326-27 (emphasis added) (footnote omitted). <u>See</u> <u>also</u> <u>John S. Boyd Co.</u>, 992 F.2d at 403-04 (construing a provision stating that "[the successor corporation] agreed to assume 'all the duties and liabilities of [its predecessor] related to [the] gas business'" and that "[the successor corporation] agreed to 'indemnify and save harmless [the predecessor corporation] from any duty or liability with respect to the gas business.").

D.

Because Paragraphs 4(c) and 8 refer circuitously to each other, it follows therefore that neither Paragraph 4(c) nor Paragraph 8 expressly require either party to indemnify the other.[9] Accordingly, our earlier analysis requires us to reject Beazer's argument that Paragraph 4(c) was intended to limit Beazer's assumption of liabilities to those expressly listed in Exhibit F, and that therefore because CERCLA is not a listed obligation Mead must indemnify Beazer under Paragraph 8(a). Beazer relies on the grammatical rule of the last antecedent to assert that the language "all in accordance with . . . Exhibit F" is a limitation on the preceding reference to "solid waste disposal . . . order" in support of its argument that the magistrate judge's construction of Paragraph 4(c)'s phrase "all in accordance with" Exhibit F to mean "which includes" Exhibit F must fail. The phrase "all in accordance with" can be interpreted as Beazer would have it, but it does not compel that construction. Beazer's contention that the magistrate judge erred when he concluded the limitation of Paragraph 4(c) to the permits expressly listed in Exhibit F would leave the words

---

[9]. Mead's duty to indemnify Beazer is set forth in Paragraph 8(a) of the Agreement. It is quoted in full _supra_, Part I, typescript at 6. It requires Mead, the seller, to indemnify Beazer, the buyer, against all liabilities other than those "expressly assumed by the Buyer." Paragraph 8(b), quoted _supra_ in note 7, is its mirror image. It requires Beazer, the buyer, to indemnify Mead, the seller, against all liabilities "assumed by Buyer."

"hereafter issued" without meaning does not persuade us. As we have already explained, its argument that these words merely reflect an intent to protect the seller during a transition period immediately following the transfer of assets to the buyer fails to shine through the murky text of Paragraph 4(c). Beazer's suggested interpretation of the words "hereafter issued" as limited to permits or licenses that might result from the pending applications is again plausible, but not so plain as to justify its construction under the Alabama rule that indemnity provisions must be strictly construed and limited to their plain meaning.

E.

Paragraph 4(c) does not clearly state that Beazer has agreed to assume all liability for toxic wastes under present or future laws protecting the environment. Though the phrase in Paragraph 4(c), "hereafter issued," appears to look to the future, the phrase "all in accordance with" appears to limit the buyer's environmental liability to orders, permits and licenses that are listed in the exhibit referenced. Accordingly, nothing in this agreement demonstrates a clear and unambiguous intent to transfer all CERCLA liability to Beazer.

Our refusal to construe Paragraph 4(c) as a clear promise by Beazer to indemnify Mead against CERCLA response costs leaves both Beazer and Mead responsible for their fair share of the cleanup costs associated with the Coke Plant. That result reinforces CERCLA policy. "Congress enacted CERCLA, a complex

piece of legislation . . . to force polluters to pay for costs associated with remedying their pollution." United States v. Alcan Aluminum Corp., 964 F.2d 252, 258 (3d Cir. 1992). Thus, we will reverse the district court's entry of summary judgment in favor of Mead and remand this case for further proceedings on Beazer's contribution claim.[10]

IV. CONCLUSION

---

[10]. Section 9613(f) provides, in relevant part:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title . . . . In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

> * * *

> A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement . . . .

42 U.S.C.A. § 9613(f)(1), (3)(B) (West Supp. 1994). The magistrate judge determined that Mead was a "responsible party" for purposes of CERCLA liability. It declined, however, to apportion the response costs or reach Mead's or Beazer's contribution claims under section 9613(f) because it found that Beazer had agreed to indemnify Mead for all CERCLA liability under Paragraph 4(c) of the Agreement. On remand, the trial court will have to revisit the parties' contribution claims and correspondingly apportion liability for the attendant CERCLA response costs.

The order of the district court granting summary judgment on Mead' counterclaim and the order dismissing Beazer's claim for contribution will be reversed and the case will be remanded to the district court for further proceedings consistent with this opinion.