[660 NYS2d 718]

PARAMOUNT COMMUNICATIONS, INC., Appellant-Respondent, v
HORSEHEAD INDUSTRIES, INC., Respondent-Appellant.

First Department, July 10, 1997

### APPEARANCES OF COUNSEL

*Leslie Gordon Fagen* of counsel (*Carey R. Ramos, Deborah E. Birnbaum* and *Anne T. Amann* on the brief; *Paul, Weiss, Rifkind, Wharton & Garrison*, attorneys), for appellant-respondent.

*Richard Godosky* of counsel (*Kenneth N. McKinney, Mark D. Coldiron* and *Paul E. Gutermann* on the brief; *Godosky & Gentile, P. C., McKinney, Stringer & Webster, P. C.*, and *Akin, Gump, Strauss, Hauer & Feld, L. L. P.*, attorneys), for respondent-appellant.

### OPINION OF THE COURT

ELLERIN, J.

In this action for a declaratory judgment the issue before us

on this appeal is whether plaintiff, Paramount Communications, Inc. (Paramount), is entitled to indemnification for liability for certain environmental claims pursuant to an agreement by which plaintiff's predecessor in interest, Gulf and Western Industries, Inc. (G&W), sold certain assets to defendant, Horsehead Industries, Inc. (Horsehead).

The historical underpinnings of this action relate back to the activities of the New Jersey Zinc Company (NJZ), which commenced smelting operations for zinc ore during the late 19th century in the vicinity of Palmerton, Pennsylvania, and, subsequently, in the vicinity of DePue, Illinois. The processes for the smelting and manufacturing of zinc at that time did not use air emission control equipment or any devices to prevent discharges of hazardous wastes into navigable waters or releases into soil and groundwater. As a result, the areas in which the smelting took place suffered drastic on-site and off-site contamination and degradation, including the formation of slag heaps permeated with heavy metals, known as "cinder banks", which, at Palmerton alone, contained approximately 30 million tons of residue.

By the late 1970's, after G&W had purchased NJZ, and after the enactment of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 USC § 9601 et seq.), also known as "Superfund", and various other environmental statutes, the cinder banks became a regulatory concern because heavy metals were leaching into the soil and into nearby waterways. Estimates made at that time indicated that cement encapsulation to prevent further leaching at the Palmerton site alone would cost approximately $50,000,000.

However, while some regulatory compliance costs were immediate and ongoing, CERCLA permitted the bulk of expenditures at either of the sites to be postponed until NJZ closed down operations at the site completely, at which point full scale, sitewide remediation and satisfaction of statutory closure obligations would be required. Moreover, while G&W did not want to retain NJZ's assets, simply selling them would not relieve it of these liabilities, since CERCLA imposes joint and several liability on past as well as current owners or operators (42 USC § 9607 [a]).[1] Consequently, G&W's preferable course of action was to sell a still viable operation.

---

1. In the absence of an indemnification agreement to the contrary, if a purchaser were held liable to the Environmental Protection Agency under CERCLA for the cleanup as a present owner, it could then seek cost recovery

Although prior to 1981 NJZ had stopped performing the actual smelting of zinc metal that involved the operation known as the "metal circuit" that was the process responsible for creating the cinder banks, it still performed other manufacturing processes and therefore its facilities could still be sold as a continuing enterprise. However, G&W found no ready buyers. One reason for this was the difficulty in arranging financing because of the huge potential environmental liability.

As a result, in 1981 defendant Horsehead was formed by former officials of G&W's Natural Resources Division and others in order to purchase the NJZ assets. G&W accepted $5,000,000 of the $55,000,000 purchase price in Horsehead stock, and part of the purchase price, in the sum of $37,000,000, was provided by bank financing. As part of the sale, G&W and Horsehead also agreed that annual environmental compliance and maintenance costs, in the neighborhood of $200,000, would be paid by Horsehead, thereby helping to assure that cleanup responsibilities would be postponed. Additionally, G&W also subsequently purchased insurance in anticipation of possible future cleanup responsibilities.

Under the terms of the asset purchase agreement, the Purchased Assets included "all of the assets and properties used in Seller's Business[2] * * * including but not limited to * * * all of the partnership interests and other interests of seller in NJZ Alloys, a Pennsylvania partnership; * * * all of seller's right, title and interest in and to all real property located in the County of Carbon, Pennsylvania [where the Palmerton site is located], the County of Sussex, New Jersey and the County of Bureau, Illinois [where the DePue site is located] and described in schedules XII, XIII and XIV, respectively; and, with respect to all real property referred to in this Clause * * * all of Seller's right, title and interest in and to all buildings, improvements and fixtures thereon and mineral rights therein". Elsewhere, the agreement represents that the

or contribution, depending on the nature of the proof, from the seller (see, Robinson, Environmental Regulation of Real Property § 22.03 [2]).

2. The first paragraph of the agreement states, "Whereas, Seller, through its Natural Resources Group at DePue, Illinois, Palmerton, Pennsylvania and Ogdensburg, New Jersey, is engaged in the business of mining, manufacturing and selling zinc oxide, zinc powder, zinc dust, zamak and other alloys, secondary materials, special anodes, rolled zinc, copper-based and other metal powders, special oxides, sinstabe, cadmium, ammonia and carbon dioxide and in the operation of Palmer Water Company and Chestnut Ridge Railway Company and, through NJZ Alloys, a partnership, in the manufacture and sale of indium metal ('Seller's Business')".

Purchased Assets include "[the] property, plant and equipment comprising the Seller's 'Metal Circuit' formerly used in the production of primary zinc metal at Seller's plant at Palmerton, Pennsylvania". Certain financial assets were specifically excluded from the sale.

The agreement contained an indemnification clause which specifically required the purchaser, Horsehead, to "*pay, perform and discharge* only the following obligations of Seller: * * * *[all commitments, obligations and requirements imposed upon Seller by virtue of any environmental,* safety and health, reclamation or other *law,* rule, regulation, action or proceeding *by any governmental agency* and any order emanating therefrom *and all liabilities, damages,* costs, obligations and requirements *imposed upon Seller* by virtue of any action or proceeding brought by any person, firm or corporation *under any environmental,* safety and health or reclamation *law* (statutory or common), rule or regulation *relating to the maintenance or operation of the Purchased Assets or to the conduct of Seller's Business at any time prior to or after the Transfer Date including, but not limited to, those matters disclosed in Schedule VIII."* (Emphasis added.)

Schedule VIII, entitled, "Defaults, Litigation, Claims, Environmental Matters, Etc.", contained a detailed listing of a variety of environmental and other matters, including State and Federal regulatory proceedings with respect to the Palmerton, DePue and Ogdensburg facilities. The various matters referred to represent existing or potential legal obligations or liabilities for which some official action, investigation or study had already taken place at the time of the consummation of the agreement, including potential liabilities relating to the discontinued operations of the metal circuits purchased by Horsehead.

The agreement further provided that, except as identified in the foregoing indemnification clause, the purchaser was to assume no other liability or obligation of the seller arising from the seller's business.

Schedule VIII also referred to an accompanying memorandum of counsel, dated September 22, 1981, addressing "federal and state environmental regulations applicable to the transfer." The reference indicated that the memorandum was "attached hereto and made a part hereof." The attachment itself indicated that its purpose was to "discuss the transferability of the applicable permits and approvals, the mechanics of the transfer, and the time at which responsibility for compliance

with environmental, health, and safety requirements will shift from NJZ to Horsehead" and analyzed the applicable regulations governing air, water, solid and hazardous wastes, and, if applicable, mining and other regulatory compliance areas, enumerated among the various properties. At the end of the discussion of the permits and regulations relevant to the Palmerton site was a reference to CERCLA reporting requirements which read:

"The Comprehensive Environmental Response, Compensation and Liability Act, 42 USC 9601 et seq., commonly known as the 'Superfund' legislation, requires reporting of all unpermitted releases into the environment of hazardous substances from facilities (42 USC 9603 [a], and requires present and past owners to report existing and abandoned hazardous waste disposal facilities that do not have approval or interim status under RCRA (42 USC 9603 [c]). 'Superfund' also establishes funding for cleanup of existing hazardous waste facilities, imposes liability for hazardous waste spills, and sets financial responsibility requirements for operators of hazardous waste treatment, storage and disposal facilities (42 USC 9607, 9611).

"If a hazardous waste site is subject to 'Superfund', the obligation to report hazardous waste sites survives the transfer of the site. Both present and past property owners who disposed of hazardous waste must report the existence of the site. 42 USC 9603 (c). The former owner may be liable for cleanup and disposal costs under 42 USC 9607 (a). *The former owner may not use an indemnification agreement to shift liability to any other person, but may obtain insurance against his own liability.*" (Emphasis added.)

In 1984, after the sale had taken place, the Federal Environmental Protection Agency (EPA) commenced a CERCLA remediation action against Horsehead and against plaintiff Paramount, as G&W's successor in interest. This action appears to be in the remedial investigation stage, with some removal action already undertaken. Both plaintiff and Horsehead have also been sued in State court under State and common-law theories. At the DePue facility, both Horsehead and plaintiff were named jointly and severally as responsible parties under the Illinois Environmental Protection Act (415 Ill Comp Stat 5/22.2 [h]) for the release of hazardous substances. Subsequently, the EPA also expressed interest in the DePue site and has presented a request for information pursuant to CERCLA. Here, too, CERCLA would impose joint and several liability. Para-

mount demanded that Horsehead indemnify and hold it harmless from the foregoing and other environmental proceedings.

Upon Horsehead's refusal, plaintiff, relying upon the indemnification provisions of the asset purchase agreement, instituted the instant action seeking a judgment declaring that it is entitled to indemnification from Horsehead for all environmental liabilities arising from the business and assets that were transferred to Horsehead, including CERCLA liabilities. Horsehead counterclaimed, seeking a declaration that plaintiff must indemnify it for all environmental liabilities arising from NJZ activities that had been discontinued at the time of the transfer, specifically including the metal circuit, and for all liabilities imposed pursuant to CERCLA or analogous State statutes that are based on emissions occurring prior to the transfer.

Upon plaintiff's motion for partial summary judgment, defendant Horsehead submitted affidavits from G&W employees and Horsehead's founder asserting that it was never intended that Horsehead indemnify G&W for environmental liabilities arising from any NJZ smelting and processing operations that were already discontinued at the time of transfer, specifically the metal circuit and the consequential creation of the cinder banks, and that, if Horsehead had assumed some $50 million in contingent liabilities, the bank loan would never have closed.

The IAS Court characterized the indemnity clause in the agreement as a broad indemnification provision and construed it to include environmental liability arising from past, including discontinued, operations, as well as that arising from current activities, and therefore found that defendant was generally obligated to indemnify plaintiff as to such liabilities pursuant to the broad language of the indemnification clause. However, as to CERCLA liabilities, the court found, as a matter of law, that a responsible party cannot shift primary cleanup responsibilities to a third party by means of indemnification agreements under CERCLA. Moreover, the IAS Court held that the agreement was ambiguous as to plaintiff's entitlement to indemnity for CERCLA obligations based on language contained in the attachment to Schedule VIII. Since the IAS Court also found, notwithstanding substantial allegations to the contrary, that plaintiff had drafted the agreement, it construed the perceived ambiguity against plaintiff and granted reverse summary judgment to defendant declaring that it had no obligation to indemnify plaintiff for such liabilities. It also granted plaintiff's motion for summary judg-

ment to the extent of declaring that defendant Horsehead was contractually obligated to indemnify plaintiff for nonCERCLA environmental claims and that plaintiff was entitled to recover sums already expended. Both parties have appealed.

 ▮ Initially, we find that the IAS Court properly rejected defendant's argument that the agreement encompasses only prospectively incurred environmental liabilities and would therefore exclude any liabilities arising from operation of the metal circuit. The agreement clearly states to the contrary and expressly provides that the purchaser (Horsehead) is assuming environmental liabilities "relating to the maintenance or operation of the Purchased Assets or to the conduct of Seller's Business *at any time prior to or after the Transfer Date* including, but not limited to, those matters disclosed in Schedule VIII." (Emphasis added.) There is no question that the environmentally degraded sites in question were among the Purchased Assets that were transferred to defendant. Nor can the plain language of the agreement be read to support defendant's strained attempt to limit the retrospective language of this clause to liabilities arising solely from the "conduct of the Seller's Business", which, it argues, is elsewhere defined as including only business actually in operation at the time of transfer, rather than to liabilities arising from either "maintenance or operation of Purchased Assets" or "conduct of the Seller's Business". Horsehead's obligations with respect to both the Seller's Business and the Purchased Assets are set forth in a single sentence in a single paragraph, with no punctuation or other indication that the phrase "at any time prior to or after the Transfer Date" applies only to one and not the other. This interpretation is in accord with the customary rule that "where general words occur at the end of a sentence, they refer to and qualify the whole; while, if they are in the middle of a sentence, and sensibly apply to a particular branch of it, they are not to be extended to that which follows" (*Matter of Budd v Valentine*, 283 NY 508, 511, quoting *Matter of New York Tel. Co. v Ferris*, 257 App Div 415, 419, *affd* 282 NY 667). That the retrospective language applies to the entire clause is further buttressed by the fact that the specifically assumed liabilities enumerated in Schedule VIII include a number of matters arising from the discontinued operations, such as other matters arising from the metal circuit.

 ▮ However, we disagree with the conclusion of the IAS Court insofar as it found that the agreement did not encompass

liabilities incurred pursuant to CERCLA. The language of the broad indemnification clause itself clearly and unambiguously requires indemnification for *all* liabilities arising from environmental laws and regulations, without any exclusion of CERCLA liabilities. We do not find an ambiguity arising from the allegedly contrary language in the memorandum attached to Schedule VIII. Significantly, the statement so heavily relied upon by the IAS Court was not contained in the agreement itself but in a memorandum attached to Schedule VIII, the stated purpose of which was to set forth the applicable laws and regulations relevant to the transaction. There is no indication whatsoever that the parties intended to set forth any new contractual term in such document, much less one that would have had the significant effect of relieving the purchaser of a liability clearly assumed in the agreement itself amounting to, at the very least, $50,000,000. In any case, the quoted passage merely makes a correct statement of the applicable law, as set forth in the statute (42 USC § 9607)[3] and since construed by a number of Federal courts to provide that a party may not escape its liability to the government for Superfund liabilities, although it may arrange contractually for someone else to actually bear the expense of those obligations that are imposed upon it (*see, e.g.*, *Harley-Davidson, Inc. v Minstar, Inc.*, 41 F3d 341, 342 [7th Cir], *cert denied* 514 US 1036; *Keywell Corp. v Weinstein*, 33 F3d 159, 165 [2d Cir]; *United States v Hardage*, 985 F2d 1427, 1433 [10th Cir]; *Boyd Co. v Boston Gas Co.*, 992 F2d 401, 405 [1st Cir]; *Commander Oil Corp. v Advance Food Serv. Equip.*, 991 F2d 49, 51 [2d Cir]), as plaintiff did here. Thus, this sentence does not conflict with, or override, the clearly delineated obligations set forth in the indemnification clause, to which Horsehead agreed.

Nor do we find it of consequence that CERCLA liability was not expressly identified in Schedule VIII, which purports to describe some, but not all, of the assumed liabilities. Since the agreement specifically states that Schedule VIII is not an exclusive list of assumed liabilities, the parties' failure to include CERCLA liability, by name, does not render the agreement ambiguous where the broad language of the agreement

---

3. "No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from * * * any person who may be liable * * * under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section." (42 USC § 9607 [e] [1].)

clearly encompasses all environmental liabilities of which CERCLA is one. More significant is the fact that CERCLA liability is not listed in Paragraph I.F (2) [a]-[f], which delineates certain limitations on the liabilities that were otherwise assumed by Horsehead under the broad language of the indemnification clause.

Accordingly, the order of the Supreme Court, New York County (Beatrice Shainswit, J.), entered May 1, 1996, which, *inter alia*, granted defendant's motion for summary judgment to the extent of declaring that defendant had no contractual duty to indemnify plaintiff for CERCLA liability, granted plaintiff's motion for summary judgment to the extent of declaring that defendant was contractually obligated to indemnify plaintiff for other environmental claims and that plaintiff could recover sums already expended, should be modified, on the law, to deny defendant's motion for summary judgment in its entirety and to grant plaintiff's motion for summary judgment declaring that defendant is obligated to indemnify plaintiff for environmental claims, including CERCLA liability, and should otherwise be affirmed, without costs.

MURPHY, P. J., ROSENBERGER and WILLIAMS, JJ., concur.

Order, Supreme Court, New York County, entered May 1, 1996, modified, on the law, to deny defendant's motion for summary judgment in its entirety and to grant plaintiff's motion for summary judgment declaring that defendant is obligated to indemnify plaintiff for environmental claims, including CERCLA liability, and otherwise affirmed, without costs.