

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-17-2001

# Horsehead v. Paramont Comm Inc

Precedential or Non-Precedential:

Docket 99-3865

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Horsehead v. Paramont Comm Inc" (2001). *2001 Decisions.* Paper 156.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/156

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 17, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-3865

HORSEHEAD INDUSTRIES, INC.,

      Appellant

v.

PARAMOUNT COMMUNICATIONS, INC.

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. Civil Action No. 3:CV-94-0298)
District Judge: Honorable Edwin M. Kosik

Submitted Under Third Circuit LAR 34.1(a)
October 25, 2000

Before: BARRY, AMBRO and GREENBERG,
Circuit Judges*

(Filed July 17, 2001)

_____

*This matter was argued on June 22, 2000 befor e the panel of the
Honorable Maryanne Trump Barry and Morton I. Greenberg, Circuit
Judges, and the Honorable Louis F. Ober dorfer, Senior United States
District Judge for the District of Columbia, sitting by designation. The
case was reassigned on June 30, 2000 to the above panel due to the
recusal of Judge Oberdorfer.

OPINION OF THE COURT

AMBRO, Circuit Judge.

The issue presented in this appeal is whether a state court judgment, which requires Horsehead Industries, Inc. ("Horsehead") contractually to indemnify Paramount Communications, Inc. ("Paramount") for all environmental costs arising from Horsehead's purchase of certain Paramount operations, subsequently can be used by Paramount collaterally to estop Horsehead's federal CERCLA contribution claim. As a threshold matter, we conclude that, under New York law, the state court declaratory judgment requiring Horsehead to indemnify Paramount is sufficiently final to be given pr eclusive effect, despite the fact that damages have yet to be decided. Applying New York's principles of collateral estoppel, we find that the scope of the indemnity provision is sufficiently broad to encompass the identical issues in the federal CERCLA contribution case, and that the parties had a full and fair opportunity to litigate the issue befor e the New York courts. We therefore affirm the decision of the United States District Court for the Middle District of Pennsylvania ("District Court") granting preclusive ef fect to the judgment of the New York Supreme Court, Appellate Division.

I. Background

At the heart of this appeal is the interplay between two sources of liability for the cost to remedy environmental damage -- a contractual indemnification pr ovision and statutory liability under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), found at 42 U.S.C. SS 9601-9627, 9651-9675, 6911a; and 26 U.S.C. SS 4611-12, 4661-62. W ith respect to the former, parties to a contract can indemnify each other for the costs stemming from environmental liabilities, and those clauses will be interpreted under traditional contract law principles. Where sufficient consideration exists -- either as a benefit to the promisor, or a detriment to the promisee -- the indemnification clause is enforceable. See

2

Holt v. Feigenbaum, 419 N.E.2d 332 (N.Y. 1981) (holding that a written promise to indemnify co-shareholders against disproportionate loss was supported by legally sufficient consideration and therefore was enforceable).

Parties may also be statutorily liable to the federal Government for cleanup costs under CERCLA, a determination made in a suit filed by the Government against potentially responsible parties. The purpose of CERCLA is "to assure that the current and future costs associated with hazardous waste facilities, including post-closure costs, will be adequately financed and, to the greatest extent possible, borne by the owners and operators of such facilities." See 42 U.S.C. S 9607; OHM Remediation Services v. Evans Cooperage Co., Inc., 116 F .3d 1574 (5th Cir. 1997) (noting CERCLA's broad, remedial purpose to facilitate prompt cleanup of hazardous waste sites and to shift costs of environmental response from taxpayers to parties who benefitted from wastes that caused harm). To effect this purpose, Congress cast the liability net wide to capture all potentially responsible parties.[1]

Under CERCLA, if a purchaser were found liable for cleanup costs, it could then seek cost recovery or

_____

1. Section 107 of CERCLA creates four categories of potentially responsible defendants:

> 1. The current owner and operator of a vessel or facility;
>
> 2. Any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of;
>
> 3. Any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances;
>
> 4. Any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person.

Frank B. Cross, Federal Environmental Regulation of Real Estate, P 2.03 (1993) (citations omitted); 42 U.S.C. S 9607(a)(1)-(4).

contribution from the seller absent an indemnification agreement to the contrary. See Nicholas A. Robinson, Environmental Regulation of Real PropertyS 22.03[2] (1998). Where such an indemnity agreement was entered into, contractual and statutory liability for r emediation co-exist. In this context, CERCLA recognizes the parties' right contractually to indemnify each other, although S 107(e)(1) does not permit the transfer of statutory liability vis a vis the Government:

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a r elease or threat of release under this section, to any other person the liability under this section. Nothing in this subsection shall bar any agreement to insur e, hold harmless, or indemnify a party to such agr eement for any liability under this section.

42 U.S.C. S 9607(e)(1). While the parties r emain jointly and severally liable for cleanup responsibility, the statute permits, inter alia, the allocation of the costs for cleanup via indemnification agreements. See SmithKline Beecham Corp., v. Rohm and Haas Co., et al., 89 F .3d 154, 158 (3d Cir. 1996) (citing Beazer East, Inc., v. Mead Corp., 34 F.3d 206, 211 (3d Cir. 1994)). Of course, "statutory liability under CERCLA endures even if contractual liability is later determined to be non-existent." GNB Battery Technologies, Inc., v. Gould, Inc., 65 F.3d 615, 621 (7th Cir. 1995).

In this appeal, the contractual liability and statutory liability for the remediation of environmental damage are allegedly in conflict because the New York state courts determined the contractual liability, including CERCLA contribution claims, to flow one way -- to Horsehead -- while the statutory liability is joint and several.

II. Factual and Procedural History

With this background, we turn to the facts before us.2

_____

2. A thorough history is presented in the New York Supreme Court, Appellate Division case titled Paramount Communications, Inc. v. Horsehead Industries, Inc., 660 N.Y.S.2d 718 (App. Div. 1997). It is this state court judgment that Paramount used collaterally to estop Horsehead's CERCLA contribution claim in the District Court.

Since the late 19th century, the New Jersey Zinc Company ("NJZ") conducted zinc ore smelting operations in the vicinity of Palmerton, Pennsylvania.3 These smelting operations did not employ air emissions control equipment or devices to prevent the leaching of hazardous wastes into the soil, groundwater or watercourses."As a result, the areas in which the smelting took place suffered drastic on-site and off-site contamination and degradation, including the formation of slag heaps permeated with heavy metals, known as `cinder banks', which, at Palmerton alone, contained approximately 30 million tons of residue." Paramount Communications, Inc. v. Horsehead Industries, Inc., 660 N.Y.S.2d 718, 719 (App. Div. 1997).

In the late 1970s, Gulf and Western Industries, Inc. (G&W), Paramount's predecessor in interest, purchased NJZ. Shortly thereafter, Congress passed CERCLA. As a result, "the cinder banks became a regulatory concern because heavy metals were leaching into the soil and into nearby waterways." Id. The financial consequences of remediation were steep. For example, estimates for the encapsulation of the Palmerton cinder banks in cement to prevent further discharge exceeded $50,000,000. Although G&W permanently closed the zinc smelting operations in December of 1980, it still performed other manufacturing processes at Palmerton. Because CERCLA imposes joint and several liability on past as well as current owners or operators, "simply selling [NJZ's] assets would not relieve [G&W] of these liabilities. Consequently, G&W's preferable course of action was to sell a still viable operation." Id. at 722.4

_____

3. NJZ also subsequently operated zinc smelting operations in the vicinity of DePue, Illinois. The appeal before us is limited to the Palmerton site.

4. The Court in Paramount noted that

> while some regulatory compliance costs were immediate and ongoing, CERCLA permitted the bulk of expenditures at either of the sites, including Palmerton, to be postponed until NJZ closed down operations at the site completely, at which point full scale, sitewide remediation and satisfaction of statutory closure obligations would be required.

Paramount, 660 N.Y.S.2d at 719.

Because of the difficulty in arranging financing for the transfer of such a huge environmental liability, former officials of G&W's Natural Resources Division formed Horsehead in 1981 to purchase certain assets at the Palmerton site.5 The Asset Pur chase Agreement ("APA") between G&W and Horsehead was entered on September 15, 1981. Given the potential environmental cleanup costs at Palmerton, G&W included an indemnity provision, found at Paragraph I.F (2) of the APA, under the heading "Assumption of Liabilities."6 The indemnity provision specifically requires Horsehead to

>     pay, perform and discharge only the following
>     obligations of Seller: . . . [a]ll commitments, obligations
>     and requirements imposed upon Seller by virtue of any
>     environmental, safety and health, reclamation or other
>     law, rule, regulation, action or proceeding by any
>     governmental agency and any order emanating
>     therefrom and all liabilities, damages, costs, obligations
>     and requirements imposed upon Seller by virtue of any
>     action or proceeding brought by any person, firm or
>     corporation under any environmental, safety and
>     health or reclamation law (statutory or common), rule
>     or regulation relating to the maintenance or operation
>     of the Purchased Assets or to the conduct of the
>     Seller's Business7 at any time prior to or after the

---

5. The agreement of sale transferred"all of seller's right, title and interest
in and to all real property located in the County of Carbon, Pennsylvania [where the Palmerton facility is located], the County of Sussex, New Jersey and the County of Bureau, Illinois [where the DePue site is located] . . . ." Id. at 720. Again, this appeal is concerned with the transfer of assets at the Palmerton facility.

6. In addition, G&W and Horsehead agreed that Horsehead would pay annual environmental compliance and maintenance costs of approximately $200,000. G&W also purchased insurance for any additional environmental cleanup costs. See Paramount, 660 N.Y.S.2d at 719–20.

7. "Seller's Business" is described in the APA as

>     the business of mining, manufacturing and selling zinc oxide, zinc
>     powder, zinc dust, zamak and other alloys, secondary materials,
>     special anodes, rolled zinc, copper-based and other metal powders,
>     special oxides, zinstabe, cadmium, ammonia and carbon dioxide
>     and . . . the operation of Palmer Water Company and Chestnut
>     Ridge Railway Company and, through NJZ Alloys, partnership, . . .
>     the manufacture and sale of indium metal . . . .

6

Transfer Date including, but not limited to, those matters disclosed in Schedule VIII.

Schedule VIII, entitled "Defaults, Litigation, Claims, Environmental Matters, Etc.," contained a detailed listing of existing or potential legal obligations or liabilities for which some official action, investigation or study had already begun at the time of the APA, including those related to the discontinued operations of the metal circuits 8 purchased by Horsehead. See Paramount, 660 N.Y.S.2d at 720.

The APA further provided that, except as identified in the indemnification provision, Horsehead would assume no other liability or obligation of the seller arising from the Seller's Business. See id. In addition, Subparagraphs[a]-[f] of Paragraph I.F(2) in the APA (directly following the indemnification provision) listed those contingent liabilities that Horsehead expressly did not assume9 and those particular legal or enforcement actions under which (1) Paramount would reimburse Horsehead, (2) the parties would share the costs, or (3) Horsehead would assume the performance and all related costs.

That the parties had contemplated CERCLA liability is evidenced by the reference in Schedule VIII to a memorandum attached thereto discussing CERCLA reporting requirements, which stated in part:

_____

8. The APA transferred, among other things, the assets comprising the metal circuits, which included the property, plant and equipment used in the production of primary zinc metal at the Palmerton facility.

9. Under Subparagraph I.F(2)[d], Horsehead expressly did not assume certain contingent liabilities in Schedule VIII. One such contingent liability is found in Schedule VIII-A2(a), which states:

> Because applicable law gives administrative agencies discretion to bring enforcement actions against closed facilities, and because the U.S. Environmental Protection Agency ("EPA") was, at the time of closing the primary zinc metal circuit at Palmerton, threatening to bring such an action against Seller to recover civil penalties for past alleged violations of applicable air-pollution control laws (primarily in respect of sulfur-oxide and particulate emissions), Seller recognizes this state of fact as repr esenting a contingent liability.
> . . .

7

> "The Comprehensive Environmental Response,
> Compensation and Liability Act, 42 U.S.C. 9601 et
> seq., commonly known as the `Superfund' legislation,
> requires reporting of all unper mitted releases into the
> environment of hazardous substances fr om facilities
> (42 U.S.C. 9603[a]), and requires pr esent and past
> owners to report existing and abandoned hazar dous
> waste disposal facilities that do not have appr oval or
> interim status under [the Resource Conservation and
> Recovery Act] (42 U.S.C. 9603[c]). `Superfund' also
> establishes funding for cleanup of existing hazar dous
> waste facilities, imposes liability for hazar dous waste
> spills, and sets financial responsibility r equirements for
> operators of hazardous waste treatment, storage and
> disposal facilities (42 U.S.C. 9607, 9611).
>
> "If a hazardous waste site is subject to`Superfund', the
> obligation to report hazardous waste sites survives the
> transfer of the site. Both present and past pr operty
> owners who disposed of hazardous waste must r eport
> the existence of the site. 42 U.S.C. 9603(c). The former
> owner may be liable for cleanup and disposal costs
> under 42 U.S.C. 9607(a). The former owner may not
> use an indemnification agreement to shift liability to any
> other person, but may obtain insurance against his own
> liability."

Paramount, 660 N.Y.S.2d at 721 (quoting Memorandum
dated September 22, 1981, attached to and made a part of
the APA) (emphasis added in opinion).

On September 8, 1983, the United States Envir onmental
Protection Agency (the "EPA"), after an investigation begun
in 1979, listed Palmerton on the CERCLA National Priority
List. Since then, Horsehead claims to have incurr ed
significant costs from studies and remediation of the
environmental conditions at Palmerton. In September,
1985, Horsehead entered into an Administrative Order by
Consent (the "Consent Order") with the EP A wherein
Horsehead agreed to fund a Remedial Investigation and
Feasibility Study of the Palmerton site. In September, 1987,
the EPA issued a Record of Decision ("ROD") for the Blue
Mountain Operable Unit,10 which, according to the EPA,

_____

10. Operable Unit 1 is an area of Blue Mountain located south of
Horsehead's East Plant at Palmerton.

8

was denuded of vegetation as a result of years of smelting operations. Horsehead agreed to design and fund the re-vegetation of a portion of the Mountain. In June, 1988, after EPA issued a ROD for the Cinder Bank Operable Unit,[11] Horsehead agreed to perform five additional studies to identify alternate response actions. On February 11, 1992, in a second amendment to the Consent Order , Horsehead agreed to undertake additional response actions related to the removal of lead from homes in Palmerton. Id. at 11-12.

Litigation of statutory liability under CERCLA began with regard to the Palmerton site in 1992, when the United States filed an action against Horsehead Resour ce Development Company, Inc.[12] and Horsehead alleging violation of certain environmental laws. United States v. Horsehead Resource Dev. Co., et al., 92-CV -0008.[13] On October 8, 1993, Horsehead filed a motion for leave to file a third-party complaint against Paramount to r ecover its remediation costs. Horsehead's motion to file its third-party complaint was subsequently denied.

In light of the Government's CERCLA action, and pursuant to a choice of law clause in the AP A, Paramount filed a contract action for damages and for declaratory judgment in the Supreme Court of New York, Trial Division, on October 14, 1993, seeking an interpretation of the contractual indemnification provision as it applied to environmental claims. The New York trial court ruled on

---

11. The Cinder Bank Operable Unit (Operable Unit 2) consists of more than 30,000,000 tons of smelter residue deposited along the base of Blue Mountain. The cinder bank is approximately 2 miles long, 500 to 1,000 feet wide, and 100 to 200 feet high. The remaining Operable Units have been designated by the EPA as Operable Unit 3, consisting of the surface soils in the Palmerton area, and Operable Unit 4, consisting of the groundwater in the same area.

12. Horsehead Resource Development Company, Inc. ("HRDC") is a wholly-owned subsidiary of Horsehead Industries, Inc.

13. Ultimately, the EPA's suit was settled by consent decree with Horsehead and HRDC. Subsequently, on April 17, 1998, the United States filed a CERCLA liability and cost r ecovery action in the Middle District of Pennsylvania against Horsehead, HRDC, Paramount and nearly 200 other parties. See United States v. Horsehead Industries, Inc., et al., No. 3:CV 98-0654.

April 24, 1996 that the contractual indemnification provision obligated Horsehead to indemnify Paramount for certain environmental costs, but did not transfer CERCLA liability costs.

Both parties appealed the New York trial court decision, and on July 10, 1997 the New York Supr eme Court, Appellate Division, agreed with the Trial Division's ruling that as a matter of law Horsehead is requir ed to indemnify Paramount pursuant to the indemnification pr ovision for certain environmental costs. But unlike the T rial Division, the Appellate Division held that the indemnification provision included those remediation costs that Horsehead is currently seeking under CERCLA. The Appellate Division refused re-argument and refused to grant Horsehead leave to appeal. Horsehead then filed a motion for leave to appeal directly in the New York Court of Appeals. The motion was dismissed on the ground that the order of the Appellate Division did not finally determine the action. Paramount Communications, Inc. v. Horsehead Industries Inc., 691 N.E.2d 634 (Table, December 22, 1997).

Notwithstanding the New York state court action, Horsehead filed a complaint in the United States District Court for the Middle District of Pennsylvania on Mar ch 1, 1994 against Paramount for contribution under S 113(f) of CERCLA, which provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable . . . . In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court deter mines are appropriate." 42 U.S.C. S 9613(f). The amended complaint included four counts. Counts I and II sought r ecovery from Paramount pursuant to S 107(a)(4) of CERCLA, 42 U.S.C. S 9607(a)(4). Count III sought contribution fr om Paramount under S 113(f) of CERCLA, 42 U.S.C. S 9613(f). Count IV sought cost recovery and also alleged public nuisance under the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), 35 Pa. C.S.A. SS 6020.101-1305. Paramount moved for summary judgment on June 4, 1999, asking that the District Court, as an affirmative defense to Horsehead's claims, give full faith and credit to the decision of the New York Supreme Court, Appellate Division. The District Court

did so, and entered summary judgment in Paramount's favor on October 21, 1999. This appeal followed.

Jurisdiction was proper in the District Court under 42 U.S.C. S 9613(b), which vests exclusive jurisdiction of CERCLA claims in the federal courts, and under 28 U.S.C. SS 1331 and 1367. Appellate jurisdiction is proper in this Court pursuant to 28 U.S.C. S 1291.

III. Legal Analysis

As noted at the outset of this opinion, we must decide whether the District Court properly invoked New York's collateral estoppel law to give preclusive ef fect to the state court judgment rendering Horsehead contractually liable for the costs stemming from environmental damage at the Palmerton site, including CERCLA claims. If so, Horsehead may not proceed on its CERCLA contribution claim against Paramount in the District Court.

We review the District Court's entry of summary judgment de novo. See Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994). We also r eview the District Court's interpretation, application, and prediction of state law de novo. See InfoComp, Inc. v. Electra Pr oducts, Inc., 109 F.3d 902, 905 (3d Cir. 1997). Rule 56(c) of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no `genuine issue for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing First National Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). We recognize that when considering a motion for summary judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. See Matsushita, 475 U.S. at 587.

A. Collateral Estoppel Under New York Law

The doctrine of collateral estoppel provides that "once a court has decided an issue of fact or law necessary to its

11

judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Allen v. McCurry , 449 U.S. 90, 94 (1980). By federal statute, "judicial proceedings . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State . .. ." 28 U.S.C. S 1738.

The parties agree that New York law governs this issue. "In adjudicating a case under state law, we ar e not free to impose our own view of what state law should be; rather, we are to apply existing state law as interpr eted by the state's highest court in an effort to pr edict how that court would decide the precise legal issues befor e us." Koppers Co., Inc. v. Aetna Cas. and Sur. Co., 98 F.3d 1440, 1445 (3d Cir. 1996) (citing Kowalsky v. Long Beach Township, 72 F.3d 385, 388 (3d Cir. 1995)). Given that we are faced with an absence of guidance from New York's highest court, we must look to decisions of state intermediate appellate courts and of federal courts interpreting New Y ork law. Id. Neither party disputes that 28 U.S.C. S 1738 r equires federal courts, in cases where state law applies, to give preclusive effect to state court judgments whenever courts of the state from which the judgment emanated would do so. What the parties dispute is whether the state court judgment in this case meets the New York collateral estoppel test such that the District Court can give it preclusive effect as a matter of law.

The District Court cited to Hickerson v. City of New York, 146 F.3d 99 (2d Cir. 1998), for New Y ork's collateral estoppel principles. Although a federal court decision, Hickerson explained and applied New York collateral estoppel law, stating that "an issue may not be r elitigated if the identical issue was necessarily decided in a previous proceeding, provided that the party against whom collateral estoppel is being asserted had a full and fair opportunity to litigate the issue in the prior action." 146 F .3d at 104 (relying on In re Sokol, 113 F .3d 303, 306 (2d Cir. 1997); Ryan v. New York Tel. Co., 467 N.E.2d 487, 490-91 (N.Y. 1984)). As to these two elements –– the identical issue and a full and fair opportunity to litigate –– "[t]he party seeking

12

the benefit of collateral estoppel has the bur den of demonstrating the identity of the issues in the pr esent litigation and the prior determination, wher eas the party attempting to defeat its application has the bur den of establishing the absence of a full and fair opportunity to litigate the issue in the prior action." In r e Juan C. v. Cortines, 679 N.E.2d 1061, 1065 (N.Y. 1997) (citing Kaufman v. Lilly & Co., 482 N.E.2d 63, 66 (N.Y . 1985)). In addition to whether the issues are identical and whether a full and fair opportunity to litigate is affor ded, embodied in New York's collateral estoppel rule is the concept of finality of judgments, i.e., that the judgment in the prior proceeding, and on which the claim to collateral estoppel is based, is final. See In re Juan C., 679 N.E.2d at 1063. Each of these principles, beginning with finality, is discussed below.

(1) Finality

New York law incorporates the threshold concept of "finality" of judgments into its collateral estoppel standard.14 The previous proceeding must result"in a final and valid judgment in which the party opposing estoppel had a full and fair opportunity to litigate." See In r e Juan C., 679 N.E.2d at 1063. However, contrary to Horsehead's argument, finality does not requir e that all appeals be completed. "The finality of a judgment for the purposes of appealability is not the same as its finality for collateral estoppel purposes." State Bank of Albany v. McAuliffe, 485 N.Y.S.2d 139, 141 (App. Div. 1985); see also Matter of Amica Mut. Ins. Co., 445 N.Y.S.2d 820, 822 (App. Div. 1981) ("The rule in New York, unlike that in other jurisdictions, is that the mere pendency of an appeal does not pr event the use of the challenged judgment as the basis of collaterally estopping a party to that judgment in a second proceeding."). Accordingly, the possibility that this judgment may be overturned during the pr oper course of

_____

14. Of course, a prerequisite to finding finality is that the judgment relied upon for collateral estoppel purposes be valid. Restatement (Second) of Judgments S 1 (1982). Neither party disputes the validity of the judgment of the New York Supreme Court, Appellate Division.

13

appellate review does not prohibit r esort to collateral estoppel.

The District Court cited Lummus Co. v. Commonwealth Oil Refining Co., 297 F.2d 80 (2d Cir . 1962), cert. denied sub nom. Dawson v. Lummus Co., 368 U.S. 986 (1962), for the distinction between finality for purposes of appeal and finality for purposes of collateral estoppel. Judge Henry J. Friendly in Lummus was interpreting New York law when he stated:

> Whether a judgment, not "final" in the sense of 28 U.S.C. S 1291, ought nevertheless be consider ed "final" in the sense of precluding further litigation of the same issue, turns upon such factors as the natur e of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review. "Finality" in the context her e relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.

297 F.2d at 89 (internal citations omitted); accord, Sherman v. Jacobson, 247 F. Supp. 261, 268 (S.D.N.Y. 1965) (" `final' in the res judicata or collateral estoppel sense is not identical to `final' in the rule governing the jurisdiction of appellate courts"). In Sherman, as in this case, the decision on which collateral estoppel rested remained open for appeal. Significantly, as the District Court in our case pointed out, the court in Sherman concluded that a judgment may be final as to some matters, even though the litigation continues as to others, and "the decision may have adjudicated liability only, leaving the assessment of damages in abeyance." Sherman, 247 F. Supp. at 268; see also Zdanok v. Glidden Co., Durkee Famous Foods Div. , 327 F.2d 944, 955 (2d Cir. 1964) ("The mere fact that the damages of the Zdanok plaintiffs have not yet been assessed should not deprive that ruling of any ef fect as collateral estoppel it would otherwise have."), cert. denied, 377 U.S. 934 (1964).

The District Court noted that while the New Y ork approach outlined in Lummus departs fr om the traditional

view of finality, it continues to garner support. See Metromedia Co. v. Fugazy, 983 F.2d 350, 366 (2d Cir. 1992) ("The mere fact that the damages awar ded to the plaintiff have not been yet calculated, though normally precluding an immediate appeal, . . . does not prevent use of a final ruling on liability as collateral estoppel."); In re Brown, 951 F.2d 564, 569 (3d Cir. 1991) ("In this case, the order of the state court granting summary judgment on liability was not final for purposes of appeal, but that does not deny it preclusive effect in the bankruptcy court."); Hennessy v. Cement and Concrete Worker's Union, 963 F. Supp. 334, 339 (S.D.N.Y. 1997) ("The fact that Hennessy could have appealed the order but chose to await a decision on the damages on the counterclaim before appealing from the dismissal of his claim does not change the conclusive effect of the final disposition of the claim.").

Applying the factors that Judge Friendly consider ed relevant, e.g., the nature of the decision, the adequacy of the hearing, and the opportunity for review, the District Court found that the New York indemnification order was sufficiently final. We agree. Horsehead fully litigated the indemnification agreement before both the New York trial court and the intermediate appellate court. Thus, the hearing and opportunity for review affor ded Horsehead were adequate. The decision rendered by the New York Supreme Court, Appellate Division, is binding on the T rial Division. Although not final for purposes of an appeal to the New York Court of Appeals given that damages r emain to be litigated, the nature of the New York Appellate Division decision as to liability is in no way tentative. Therefore, we conclude that, for purposes of collateral estoppel, the decision is final.

### (2) Identical Issues

Under New York law, the burden r ests on Paramount to demonstrate that the issues litigated in the separate proceedings were identical. See Ryan, 467 N.E.2d at 490. For an issue to be identical, "it must be the point actually to be determined in the second action or pr oceeding such that `a different judgment in the second would destroy or impair rights or interests established by thefirst.' " Id. The

15

issue in the New York Supreme Court, Appellate Division, proceeding was whether Paramount was entitled to indemnification for liability for certain envir onmental claims pursuant to its indemnification agreement with Horsehead. The state appellate court made an express finding that the indemnification provision included CERCLA contribution claims. See Paramount, 660 N.Y.S.2d at 723. The threshold issue in the District Court proceeding seeking contribution from Paramount for response costs under CERCLA is whether the scope of the indemnification pr ovision covers CERCLA liability costs. If it does, then the issue in the state contract and federal CERCLA contribution proceedings is, for our purposes, identical.

Courts that have considered the issue r ecognize that "the questions of CERCLA liability and the interpr etation of any indemnification agreement among the parties liable for the clean-up are inextricably related." GNB Battery Technologies, Inc. v. Gould, Inc., 65 F .3d 615, 621 (7th Cir 1995) (citing Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321 (7th Cir. 1994)). Moreover, in the context of asset purchase or transfer agreements, courts (including this Court) have held that CERCLA claims are subsumed within broad contractual indemnification pr ovisions. See, e.g., SmithKline Beecham Corp. v. Rohm and Haas Co., et al., 89 F.3d 154, 160 (3d Cir. 1996) (holding that the language in the Purchase Agreement indemnity provisions is general enough to evidence the parties' intent to include CERCLA response costs, even though not specifically enumerated); GNB Battery Technologies, 65 F.3d at 622 (concluding that the plain language of the assumption agreement was sufficiently broad to encompass any CERCLA liabilities that may arise, even though no specific reference to CERCLA was made); Beazer East, Inc. v. Mead Corp., 34 F.3d 206, 211 (3d Cir. 1994) ("we must look to see whether an indemnification provision is either specific enough to include CERCLA liability or general enough to include any and all environmental liability which would, naturally, include subsequent CERCLA claims"). Applying New York law to indemnity and release pr ovisions, courts have reached similar conclusions. See Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 14 (2d Cir. 1993) (concluding that an agreement transferring"all liability"

16

transfers responsibility for all CERCLA liability, even if it
does not expressly reference CERCLA); see also Purolator
Prods. Corp. v. Allied–Signal, Inc., 772 F. Supp. 124, 130
(W.D.N.Y. 1991) (concluding that, under two broad
indemnity clauses, the purchaser clearly agr eed to take the
assets along with any liabilities, including CERCLA
liabilities, that might attach to them).

Thus, in a CERCLA contribution action where the parties
entered into an indemnification agreement, the proper
inquiry is whether the indemnification provision "is either
specific enough to include CERCLA liability or general
enough to include any and all environmental liability which
would, naturally, include subsequent CERCLA claims."
Beazer East, Inc., 34 F.3d at 211. The interpretation of the
scope of the contractual indemnity provision in this case is
guided by state law, and the parties agree that New York
law applies. See SmithKline Beecham Corp., 89 F.3d at 158–
59 ("We apply state law to determine whether a particular
indemnification provision encompasses CERCLA response
costs.") (citing Hatco Corp. v. W.R. Grace & Co., 59 F.3d
400, 405 (3d Cir. 1995)); Olin Corp., 5 F.3d at 15
(concluding that federal courts should incorporate state law
when interpreting contractual agreements allocating
CERCLA liability).

The Court in Olin summarized the relevant principles of
New York contract law developed by the New Y ork Court of
Appeals in Slatt v. Slatt, 477 N.E.2d 1099, 1100 (N.Y.
1985). Under that law, "it is our function to`discern the
intent of the parties to the extent their intent is evidenced
by their written agreement.' " Olin, 5 F.3d at 15 (citing
Commander Oil Corp. v. Advance Food Serv. Equip., 991
F.2d 49, 51 (2d Cir. 1993) (quoting Int'l Klafter Co. v.
Continental Casualty Co., 869 F.2d 96, 99 (2d Cir. 1989)
(citing Slatt, 477 N.E.2d at 1100 (N.Y . 1985)))). "Where the
intention of the parties is clearly and unambiguously set
forth, effect must be given to the intent as indicated by the
language used." Slatt, 477 N.E.2d at 1100. However, we
note that "in New York[,] indemnification agreements are
strictly construed; a court cannot find a duty to indemnify
absent manifestation of a `clear and unmistakable intent' to
indemnify." Commander Oil, 991 F.2d at 51 (citing

17

Heimbach v. Metropolitan Transp. Auth. , 553 N.E.2d 242, 246 (N.Y. 1990)).

The District Court's discussion of this issue is unfortunately conclusory:

> [R]egardless . . . whether the New Y ork action can or cannot be characterized as one seeking CERCLA damages, the thrust of the New York pr oceeding was exclusively an action on a contract to deter mine if Paramount was entitled to indemnity from [Horsehead] under the contract provision dealing with environmental damage claims in Palmerton, Pennsylvania and elsewhere for which Paramount may be liable. Accordingly, there are no factual issues over environmental damages which would preclude summary judgment on the indemnity question.

Dist. Ct. Op. at 7. The District Court granted summary judgment in favor of Paramount, concluding that "[w]e can find no reason for proceeding with this second case between the parties when in the first case in New York there is a claim which was litigated and may very well moot this action." Id. at 10. The District Court, in reading the Paramount decision of the Appellate Division of the New York Supreme Court, was satisfied that the indemnification provision encompassed all of the environmental claims, including the CERCLA contribution claims befor e it, such that the identical issue was present to pr eclude litigating the CERCLA contribution claim in the District Court.

The indemnification provision in this case is considerably broad, holding Horsehead responsible for the costs associated with all environmental liabilities stemming from "Seller's Business" and the "Purchased Assets" at the Palmerton site. Specifically, Horsehead must indemnify Paramount for "all liabilities, damages, costs, obligations and requirements . . . under any envir onmental, safety and health or reclamation law." The indemnification provision applies to "the maintenance or operation of the Purchased Assets or to the conduct of the Seller's Business at any time prior to or after the Transfer Date."

This provision shows a clear and unmistakable intent to include all environmental claims, including claims for

18

contribution under CERCLA. The circumstances surrounding the transfer of assets, most notably that Horsehead was formed by officials of Paramount's predecessor for the purpose of transferring the environmental liability associated with the Palmerton site, id. at 719, confirm that intent. W e agree with the New York Supreme Court, Appellate Division, which made a thorough inquiry as to the scope of the indemnification pr ovision, that "[t]he language of the broad indemnification clause itself clearly and unambiguously requir es indemnification for all liabilities arising from environmental laws and regulations, without any exclusion of CERCLA liabilities." Id. at 722.

However, the indemnification provision was accompanied by contractual limitations on Horsehead's liability. Horsehead argues that these limitations, notably the exceptions enumerated under Subparagraphs I.F(2)[a]-[f] of the APA and Schedule VIII appended to it, defeat the identicality between contractual liability and CERCLA liability. Contractually, Horsehead would not be r esponsible for certain contingent liabilities it expressly declined. See supra, note 9. Yet under CERCLA's statutory liability, Horsehead posits that it may be responsible for those same contingent liabilities. Horsehead contends that the District Court's decision in this case sidesteps CERCLA's contribution mechanism and requires Horsehead to reimburse Paramount for all CERCLA claims, even those expressly excepted in the APA and those associated with the assets not purchased by Horsehead. In other words, Horsehead argues that the universe of CERCLA liabilities may exceed those liabilities for which Horsehead must reimburse Paramount under the indemnification agreement, and thus the requisite identicality of issues is missing.

Where an indemnification agreement exists, the threshold inquiry in a CERCLA contribution case is the same as the inquiry the New York Supreme Court, Appellate Division, undertook: whether the scope of the indemnification provision is broad enough to encompass liability for CERCLA response costs. With respect to Horsehead's arguments, we first note that Horsehead is confusing the

determination of CERCLA liability with the function of an indemnification agreement, which covers the allocation of cleanup costs among its parties. Similar to an insurance policy, the indemnification agreement transfers the responsibility for who pays the response costs regardless of liability. Moreover, CERCLA recognizes the parties' right to indemnify each other by agreement for r esponse costs, as they have done. See SmithKline Beecham Corp., 89 F.3d at 158 ("Thus responsible parties can lawfully allocate CERCLA response costs among themselves while r emaining jointly and severally liable to the government for the entire clean-up.").

We have also reviewed the limitations on Horsehead's liability in Subparagraphs I.F(2)[a]-[f] of the APA and Schedule VIII attached thereto, and find nothing that changes the intent of the parties or renders the indemnification provision ambiguous such that it would not include CERCLA response costs. In GNB Battery Technologies, a case with relevant similarities, the Seventh Circuit held that the plain language of the assumption agreement unambiguously transferred all of seller's liabilities, including CERCLA liabilities, despite the fact that specific exemptions from liability wer e enumerated. 65 F.3d at 623. The Court concluded that "[t]he enumeration of these exemptions indicates that the parties intended to exempt only the situations that they specifically itemized." Id. Therefore, because CERCLA liabilities specifically were not itemized as exemptions, they were intended to be included by the parties. Moreover, the fact that the exemptions existed did not operate to defeat the inclusion of CERCLA liabilities.

In this case, Horsehead argues that the CERCLA liabilities and the exceptions listed in Schedule VIII overlap. Under Subparagraphs I.F(2)[a], [b],[c], and [e] of the APA, Horsehead assumes the full performance and costs associated with specific litigation or consent or ders except where Paramount agrees to reimburse Horsehead for some portion of those costs. In Subparagraph I.F(2)[d], Horsehead expressly declines any contingent liability associated with certain fugitive emissions at the Palmerton site. In Subparagraph I.F(2)[f], Horsehead declines liability from an

20

industrial accident not related to the Palmerton site. These limitations on liability will likely be consider ed in the damages phase of the New York litigation. However, they do not alter our holding here that the plain language of the APA demonstrates the intent that Horsehead indemnify Paramount for all environmental claims, including claims for contribution under CERCLA.

Moreover, that these exceptions to Horsehead's liability do not specifically mention CERCLA liability supports the view that the parties intended that CERCLA liability be included within the broad scope of envir onmental claims for which indemnification exists. As the New Y ork appellate court noted, "the parties' failure to include CERCLA liability, by name, does not render the agr eement ambiguous where the broad language of the agreement clearly encompasses all environmental liabilities of which CERCLA is one. More significant is the fact that CERCLA liability is not listed in [Subparagraphs] I.F(2)[a]-[f], which delineates certain limitations on the liabilities that were otherwise assumed by Horsehead . . . ." Paramount, 660 N.Y.S.2d at 723.

Further support for this view comes from the other side of the same coin. That the parties to the AP A knew well of CERCLA, and thus could have dealt with it by name in the APA, is made clear by the memorandum attached to Schedule VIII specifically mentioning CERCLA. While the Trial Division of the New York Supr eme Court found the language in the memorandum mentioning CERCLA, and declaring that "[t]he former owner may not use an indemnification agreement to shift liability to any other person, but may obtain insurance against his own liability," to create an ambiguity as to the parties' intent to include CERCLA costs within the broad indemnity pr ovision, the Appellate Division disagreed. "[The memorandum] merely makes a correct statement of the applicable law, as set forth in the statute. . . . Thus, this sentence[quoted in this paragraph, above] does not conflict with, or override, the clearly delineated obligations set forth in the indemnification clause, to which Horsehead agr eed." Id. at 722-723.

21

In sum, we are satisfied that the broad indemnification provision here includes CERCLA contribution claims. Therefore, for collateral estoppel purposes the issue litigated in the New York state courts is identical to the issue that was before the District Court. For the District Court to have concluded otherwise would thwart Paramount's right to indemnification for CERCLA costs established in the first action in the New York state courts.

### (3) Full and Fair Opportunity to Litigate

Under New York law, the doctrine of collateral estoppel applies to preclude relitigation of an issue where it is found that the litigant against whom preclusion is sought in the current proceeding had a full and fair opportunity to litigate the issue in the prior proceeding. See Gilberg v. Barbieri, 53 N.Y.2d 285, 291 (1981). "The party attempting to defeat the application of collateral estoppel has the burden of establishing the absence of a full and fair opportunity to litigate the issue in the prior action." In re Juan C. v. Cortines, 679 N.E.2d 1061, 1065 (N.Y. 1997).

As already noted, Horsehead has fully litigated the interpretation of the indemnity clause in the New York trial and appellate courts. Even though this judgment may later be overturned during the proper course of appellate review of damages, New York law does not prohibit the application of collateral estoppel. While we acknowledge that the courts of New York have refused to give preclusive effect to an interlocutory order, see, e.g., Morley v. Quinones, 208 A.D.2d 813 (N.Y. App. Div. 1994), this line of decisions did not confront the situation where the order was reviewed by at least one appellate court. The case before us more closely resembles a pending appeal where finality can be found than an interlocutory order in which the parties had no opportunity to file an appeal.

* * * * *

Accordingly, we conclude that all three requisite elements of New York collateral estoppel law exist-- finality, identical issues, and a full and fair opportunity to litigate-- and we affirm the decision of the District Court on this issue.

22

B. Rule 60(b)(5)

Horsehead also argues that the District Court erred by proactively invoking Rule 60(b)(5) of the Federal Rules of Civil Procedure to shield its decision-making, suggesting that if its decision were wrong, it could easily be reopened. Rule 60(b)(5) provides:

> On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order, or proceeding for the following reasons: (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application.

Fed. R. Civ. P. 60(b)(5).

We agree with Horsehead that this Rule should not be relied on by district courts when facing difficult decisions. However, the District Court in this case did no such thing. Analyzing the case before it under New York law, the District Court found adequate grounds to give preclusive effect to the New York appellate court's judgment. Its reference to Rule 60(b)(5) was to note that the Rule specifically contemplates relief where a judgment given preclusive effect was subsequently reversed, the very situation complained of by Horsehead. The District Court did not misuse Rule 60(b)(5), and we are not persuaded by Horsehead's argument on this point.

IV. Conclusion

For the reasons stated, we affirm the District Court's entry of summary judgment in favor of Paramount based on the preclusive effect of the New York Supreme Court, Appellate Division, decision in Paramount Communications, Inc. v. Horsehead Industries, Inc., 660 N.Y.S.2d 718 (App. Div. 1997).

23

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit