

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-31-2005

# Caldwell Trkng PRP v. Rexon Tech Corp

Precedential or Non-Precedential: Precedential

Docket No. 03-2346

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Caldwell Trkng PRP v. Rexon Tech Corp" (2005). *2005 Decisions.* Paper 577.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/577

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No: 03-2346
_____

CALDWELL TRUCKING PRP, an organization of defendants
in Civil Action No. 94-1473 (WGB) (D.N.J.) for themselves and
on behalf of other settling defendants whose contribution
claims they may assert pursuant to an Assignment of Right

<u>Appellants</u>

vs.

REXON TECHNOLOGY CORP; PULLMAN
TRANSPORTATION COMPANY; S.B. THOMAS INC.; ADT
AUTOMOTIVE, INC., (PARENT TO SKYLINE
AUTOMOTIVE EXCHANGE); AERO METAL PRODUCTS
CORP., (SUBSIDIARY OF HILLSIDE SPINNING &
STAMPING CO.); AIRE-SCIENCES INC., (SUCCESSOR-IN-
INTEREST TO EDO-AIR DIVISION OF EDO
CORPORATION); ALFA MACHINE & TOOL CO., INC.;
ALLEN BRADLEY COMPANY, INC.,
(SUCCESSOR-IN-INTEREST TO THETA INSTRUMENTS
CORP.); AMERICAN TELEPHONE & TELEGRAPH CO.,
(SUCCESSOR-IN-INTEREST TO WESTERN ELECTRIC
CO.); ANDERSON & VREELAND, INC., (INDIVIDUALLY
AND AS SUCCESSOR-IN-INTEREST TO WILLIAMSON &
CO., INC.); ANJUL INC.; ARCS FABRICATORS INC.;
ASSOCIATED TESTING LABORATORIES; BAUREIS
REALTY CO., INC.; BAXTER RUBBER CO., INC.; BECTON
DICKINSON & COMPANY; BEE CHEMICAL CO., INC.,
(WHOLLY-OWNED SUDSIDIARY OF MORTON
INTERNATIONAL, INC.; BELL MOLDED PRODUCTS INC.;
BILTRITE TOOL & DIE; BLOOMFIELD
MANUFACTURING CO., INC.; BROWNING-FERRIS
INDUSTRIES OF PATERSON NEW JERSEY, INC.; CANTEL
INDUSTRIES, INC., (SUCCESSOR-IN-INTEREST TO
CHAROZ-CARSON CORP.); CARTRIDGE ACTUATED
DEVICES, INC.; CHEM SYSTEM, INC.; CHRONOS

RICHARDSON, INC., (SUCCESSOR-IN-INTEREST TO HOWE-RICHARDSON COMPANY, INC.); COBEHN, INC; COLTEC INDUSTRIES, INC., (FORMERLY KNOWN AS COLT INDUSTRIES, INC., CRUCIBLE STEEL DIVISION, SUCCESSOR-IN-INTEREST TO CRUCIBLE SPECIALTY METALS CO.); CONOPCO, INC., (SUCCESSOR-IN-INTEREST TO GOOD HUMOR CORP.); COOK & DUNN PAINT CORP.; CRANE CO., INC.; CWC, INC., (SUCCESSOR-IN-INTEREST TO CULLIGAN WATER CONDITIONING COMPANY OF NORTH JERSEY, INC.); DELTA SALES CO., INC.; AIROYAL DIVISION, (SUCCESSOR-IN- INTEREST TO AIRROYAL MANUFACTURING CO., INC.); EASTERN CYCLONE INDUSTRIES, INC.; FAIRFIELD FILTER CORP.; FAIRFIELD TEXTILES CORP., (INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO OTTEX, INC.); FLM GRAPHICS CORPORATION; FOLANDER SHEET METAL CO., INC.; FORD MOTOR COMPANY, INC.; FROELICH/GREENE COLORPRESS, INC., (SUCCESSOR-IN-INTEREST TO COLORPRESS, INC.); GARFIELD INDUSTRIES INC.; GEC MARCONI ELECTRONIS SYSTEMS CORPORATION, (SUCCESSOR-IN-INTEREST TO KEARFOTT DIVISION OF THE SINGER COMPANY, INC.); GENERAL HOSE PRODUCTS, INC.; GENERAL WAYNE GLASS, INC.; HERCULES, INC., (SUCCESSOR-IN-INTEREST TO ESGRAGH, INC.); HILLSIDE SPINNING AND STAMPING CO., INC., (PARENT CORPORATION TO AERO METAL PRODUCTS CORP.); HOFFMANN-LA ROCHE, INC.; SOLBERN DIVISION, SUCCESSOR-IN-INTEREST TO SOLBERN CORP.; HOWDEN GROUP AMERICA, INC., (PARENT TO HOWDEN FOOD EQUIPMENT, INC., SOLBERN DIVISION SUCCESSOR-IN-INTEREST TO SOLBERN CORP.); HURCO MANUFACTURING CO., DIVISION OF HURCO COMPANIES, INC. (SUCCESSOR-IN-INTEREST TO ELTEE ENTERPRISES, INC. AND ELTEE PULSITRON, INC.); INDUSTRIAL BRUSH CO., INC; INGERSOLL-RAND COMPANY, INC.; JAYSON OIL COMPANY, (SUCCESSOR-IN- INTEREST TO HULTS SERVISOFT WATER SERVICE, INC.); JERSEY SPECIALTY CO., INC.; K&N NAMEPLATE, INC.; KONNER CHEVROLET, INC.; KREISLER INDUSTRIAL CORP; L.F.E.

& C., INC., (SUCCESSOR-IN- INTEREST TO WEST ESSEX PLUMBING SERVICE); LAWSON PRODUCTS, ; LEWIS STUDIOS, INC; LITTON INDUSTRIES, INC.; MELLONICS SYSTEM DEVELOPMENT DIVISION, (SUCCESSOR-IN-INTEREST TO INFORMATICS GENERAL CORP.); MARVEL MANUFACTURING CO., INC.; MERRIMAC INDUSTRIES, INC., also known as MERRIMAC RESEARCH AND DEVELOPMENT, INC.; MONTE SANO & COMPANY, INC.; MYLES F. KELLEY, INC., (SUCCESSOR-IN-INTEREST TO PINEBROOK LUMBER CO.); NATIONAL PRECISION TOOL CO., INC.; NEW JERSEY BELL TELEPHONE CO; PENTEL OF AMERICA, LTD; PIO COSTA ENTRERPRISES; PPG INDUSTRIES, INC.; PYMAH CORPORATION, (PARENT CORPORATION TO INFO-CHEM, INC., A SUBSIDIARY); R&L SHEET METAL CO., INC.; RADIATION SYSTEMS, INC.; ANGHEL LABORATORIES DIVISION, (SUCCESSOR-IN-INTEREST TO ANGHEL LABORATORIES, INC.); RAPP WELDING & DIESEL SERVICES, INC.; RELIANCE ELECTRICAL,CO., INC.; REPUBLIC TOOL & MANUFACTURING CO., INC.; RUDOLPH RESEARCH CORP.; SEARS ROEBUCK & CO., INC.; SMITHS INDUSTRIES AEROSPACE & DEFENSE SYSTEMS, INC., (SUCCESSOR-IN-INTEREST TO CONRAC CORP., SYSTEMS EAST DIVISION); SUMCO INC.; SUMMIT SCIENTIFIC CORP.; THE EVANS PARTNERSHIP, doing business as EVANS SHURE CONSTRUCTION; 350 PASSAIC ASSOCIATIONS, INC., (SUCCESSOR-IN-INTEREST TO ELECTRO-NUCLEONICS, INC.); TILTON RACK & BASKET CORP.; TITANIUM METALS CORPORATION; TRW, INC.; UNIMATIC MANUFACTURING CORP.; VIBRA SCREW, INC.; WAVELINE, INC.; WELSH FARMS, INC.; WOOLSULATE CORPORATION; YELOF CORP, also known as D&J METAL FINISHING COMPANY, SUCCESSOR-IN-INTEREST TO FOLEY METAL FINISHING CO.; CALDWELL TOWNSHIP, A MUNICIPAL CORPORATION OF THE STATE, OF NEW JERSEY; CEDAR GROVE TOWNSHIP, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY; MONTVIHIP, (PINEBROOK), A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY; PASSAIC CITY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY; TOTOWA BOROUGH, A

MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY; WAYNE TOWNSHIP, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY; JOHN DOE DEFENDANTS, 1 through 50; JOHN DOE DEFENDANTS, A through Z; JOHN ROE DEFENDANTS, 1 through 10; AMERICAN SOUND & VIDEO CORPORATION, (SUCCESSOR-IN- INTEREST TO RKO TAPE CORP.); ASSOCIATED TESTING LABORATORIES, INC.; HAROLD BERNSTEIN, Indemintor of ADT Automotive, Inc.; BOR CORP, Formerly Dothan Auto Exchange, Inc.- Indemnitor of ADT Automotive Inc., Formerly Hatfield Auto Auction, Inc., Formerly Skyline Auto Exchange, Inc., Formerly Keystone Recon Center, Inc.; ESTATE OF FRANCIS L. CARTER, Indemnitor of ADT Automotive, Inc., CONRAC CORPORATION; EDO CORPORATION, Parent of Edo-Air Division; ENVIROSOURCE INC., Successor to Solbern Corporation; HENRY FULOP, Indemnitor of ADT Automotive, Inc., JOSEPH A. KEATING, Indemnitor of ADT Automotive, Inc.; R&F ALLOY WIRES, CO; HARRY MONTVILLE; MUNICIPAL UTILITIES AUTHORITY, A municipal corporation of the State of New Jersey; WAYNE TOWNSHIP BOARD OF EDUCATION, A municipal corporation of the State of New Jersey; PINE BROOK BUILDING SUPPLY, CO., AMERADA HESS CORP; BREED CORP; C.M.W. CORPORATION; C.M.W.L. ASSOCIATES, L.P.; CHARLES MICHAEL REALTY COMPANY; DUTCH LANE DEVELOPMENT COMPANY; EVANS SHURE CONSTRUCTION; GUSMER & MARTIN, INC.; HARRIS & SANITATION; HEISLER MACINE & TOOL, INC.; MORRIS SEPTIC TANK, Morris Septic Tank Company, Inc.; NORTH AMERICA PHILLIPS CORPORATION; ROXBURY TOWNSHIP; CHARLES EVANS DEVELOPMENT COMPANY; WITCO CORPORATION ADT AUTOMOTIVE, INC., (PARENT TO SKYLINE AUTOMOTIVE EXCHANGE); THE EVANS PARTNERSHIPS d/b/a EVANS SHURE CONSTRUCTION COMPANY; LITTON INDUSTRIES, INC.; PENTEL OF AMERICA, LTD.; SMITHS INDUSTRIES AEROSPACE & DEFENSE SYSTEMS, INC.; MYLES F. KELLY, INC.; MONTE SANO AND COMPANY, INC.; BILTRITE TOOL & DIE, CO.; PIO COSTA ENTERPRISES; GUSMER & MARTIN, INC.; AERO METAL PRODUCTS CORP.; BREED CORPORATION; FAIRFIELD FILTER

CORP.; WITCO CORPORATION; JERSEY SPECIALTY CO., INC.; TOTOWA BOROUGH; ASSOCIATED TESTING LABORATORIES, INC.; THE PULLMAN TRANSPORTATION COMPANY,

<u>Defendants/Third-Party Plaintiffs</u>

vs.

STORA KOPPARBERG; TELEMAX; T.J. LIPTON; TRW, INC.; UCKO; UNIVERSAL STORAGE WAREHOUSE; WOMETCO, INC.; YALE SECURITY, INC.; INTERSTATE ELECTRONICS CORPORATION; CONRAC TECHNOLOGY CORPORATION; CONRAC ELECTRON, INC.; BELGARVE INDUSTRIES; CONRAC DISPLAY PRODUCTS, INC.; MARK IV HOLDINGS, INC.; HOWDEN FLUID SYSTEM, INC.; BOR CORP, formerly Skyline Auto Exchange, Inc.; BOR CORP., formerly Hatfield Auto Auction, Inc.; BOR CORP, formerly Keystone Recon Center, Inc.; SKORB CORP., formerly Hatfield Auto Transport, Inc.; BOR CORP, formerly Johnston Auto Auction, Inc.; BOR CORP, formerly Dothan Auto Exchange, Inc.; AUCTION ADVISORS, LTD.; LOUIS STERN; JAMES K. WOLOSOFF; THE EVANS PARTNERSHIP, d/b/a Evans Shure Construction Company; ADDRESS O GRAPH, INC.; ARIES CORPORATION; ASTLETT; BARD PARKER, a division of Becton-Dickinson and Company; BECTON-DICKINSON AND COMPANY; DIGITAL ELECTRONIC SYSTEM, INC.; EQUITAMATICS, INC.; EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, EQUITABLE LIFE COMPANY; GOOD HUMOR CORPORATION; HONEYWELL, INC.; INTERNATIONAL BUSINESS MACHINE CORP; INFORMATICS, INC.; MEMOREX CORPORATION; PHILLIPS PETROLEUM COMPANY; RAPIDATA, INC.; RICOH CORPORATION; SINGER COMPANY, THE SINGER COMPANY; SPERRY RAND CORPORATION; STERLING SOFTWARE, INC.; STANDARD PUBLISHING CO.; CONRAC CORPORATION; JOHN DOE; CORPORATIONS 1-10; PINE BROOK BUILDING SUPPLY, CO., INC.; LOUIS MALACHOWSKY; ROBERT MALACHOWSKY; MACY'S EAST, INC.; DRAGHI A.W. GROUND PRODUCTS CO.; ANTON COMPANY, A NEW JERSEY LIMITED PARTNERSHIP; GEORGE O'CONNOR;

RUTH ANN O'CONNOR; OKON CORPORATION; CALDWELL TRUCKING COMPANY,

                         Third-Party Defendants

                              vs.

HAROLD BERNSTEIN; HENRY FULOP; JOSEPH A. KEATING; ESTATE OF FRANCIS L. CARTER; JOHN DOES A THROUGH Z; JOHN ROES A THROUGH Z; ABC CORPORATIONS AND/OR PARTNERSHIPS A THROUGH Z,

                         Fourth-Party Defendants

              The Pullman Company, Rexon Technology
              Corporation and Mark IV Industries, Inc.,
                         Appellants

                    _____


         APPEAL FROM THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
                    (D.C. Civ. No. 95-cv-01690)
             District Judge:  Honorable Dennis M. Cavanaugh
                    _____


                      Argued May 2, 2005
         Before:  NYGAARD, AMBRO and WEIS, Circuit Judges.


                   (Filed:  August 31, 2005)
                    _____


Gregory J. Coffey, Esquire (ARGUED)
Coffey & Associates
465 South Street
Morristown, New Jersey 07960

Greiner & Chadsey
5687 Main Street
Williamsville, New York   14221

Of Counsel:
             Deborah J. Chadsey, Esquire

Gregory J. Coffey, Esquire

On the Brief:

        Gregory J. Coffey, Esquire
        Deborah J. Chadsey, Esquire
        Richard J. Deweand, Esquire

Attorneys for Appellants, The Pullman Company, Rexon
Technology Corporaiton and Mark IV Industries.


H. Curtis Meanor, Esquire (ARGUED)
J. Barry Cocoziello, Esquire
Steven R. Tombalakian, Esquire
Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello
A Professional Corporation
One Riverfront Plaza
Newark, New Jersey 07102-5497

Attorneys for Appellee, Caldwell Trucking PRP Group.

_____

OPINION
_____


WEIS, Circuit Judge.

        In this appeal we conclude that the text of a retention of liabilities provision in a stock purchase agreement requires assumption of CERCLA responsibilities by the seller, rather than simply indemnification. We also decide that prejudgment interest and the cost of an experimental treatment process are reasonable in a contribution suit under CERCLA section 113. 42 U.S.C. § 9613.


**I.**

        Caldwell Trucking Company provided liquid waste disposal service at its premises in Fairfield, New Jersey. From 1948 to 1974, the waste was deposited in several lagoons on the site, but, beginning in 1975, it was stored in tanks and from there taken to ocean disposal facilities.

Defendant Rexon had plants in Fairfield and Wayne, New Jersey where it manufactured electronic components and fuses for military applications. These activities involved the use of de-greasing substances, which are classified as hazardous materials. Beginning in 1960, Caldwell Trucking provided Rexon with waste disposal for all types of materials in the septic tanks on its properties.

The EPA listed the Caldwell property on the National Priorities List of Superfund Sites in 1983 and issued Records of Decisions in 1986 and 1989, calling for remediation of the contamination present there. Caldwell Trucking and nine other firms (the "Caldwell Group" or "Group") acceded to a consent decree in 1994 providing for remediation and reimbursement to federal and state governments for previously incurred expenses. The Group, the plaintiff here, sought contribution from the many customers of the Caldwell Trucking Company. Most of the claims were settled, but because of a dispute over the interpretation of an agreement between defendants Rexon and the Pullman Company, the claim involving them continued.

At various times, Rexon's stock had been owned by several parent companies.[1] Relevant to the case at hand was the purchase by defendant Pullman Corporation in October of 1984 and the sale of all of the stock to a new parent corporation in April 1989. The new parent corporation continued operations using the Rexon name until Rexon was dissolved on June 30, 1995. In the interest of clarity, we will use the name of Rexon, despite its varying parentage, to designate the manufacturing entity found to have contributed to the pollution.

## II.

On April 6, 1995, the Caldwell Group filed this suit against Pullman Company, Rexon and the other alleged responsible entities. Rexon's registered agents in New Jersey and Delaware

---

[1] (1) REDM Corporation/Industries (sole shareholder of Rexon) - formed in 1958; went public in 1960; (2) Pullman purchased REDM, and became the indirect owner of Rexon, in 1984; (3) Little Falls Acquisition purchased REDM, and became the indirect owner of Rexon, in 1989; (4) REDM later merged with Rexon, and Little Falls became Rexon's direct shareholder.

were served with process on April 17, 1995 and May 30, 1995, respectively.

The District Court entered summary judgment on liability in favor of the Caldwell Group against Rexon and Pullman. The critical dispute in that phase of the case was the interpretation of a provision in the 1989 stock purchase agreement assigning responsibility for environmental claims against Pullman and Rexon. The District Court defined the issue as whether Pullman was directly liable or whether it was "merely limited to an exclusive indemnification of Rexon."

Particularly important to the District Court's ruling is paragraph § 1.05, captioned "Seller's Retention of Certain Liabilities," in which Pullman "agrees to assume and become liable for, and pay, perform and discharge and to indemnify...." As the District Court construed the agreement, the parties intended to attribute direct liability to Pullman for a wide range of costs associated with violations of, or noncompliance with, "Environmental Laws as of or prior to the closing date" of the sale in 1989.

The Caldwell Group's claims and the judgment in its favor are not based on the parent/subsidiary relationship between Pullman and Rexon, but rather on Pullman's contractual assumption of responsibility. The District Court pointed out that Rexon had become responsible for its dumping from 1962 to 1982 at the Caldwell site, even though the damage had not become manifest until 1986, three years before the sale. The Court ruled that the contractual provision made Pullman directly liable to the Caldwell Group for Rexon's obligations.

Following the entry of summary judgment on liability against Rexon and Pullman, the Court conducted a bench trial to determine the amount of damages. In extensive findings of fact, the Court considered such matters as the appropriate remediation, the proper costs, and the ingredients in the waste generated by Rexon. These factors led to an allocation of expenses among the other waste generators and Rexon.

The Court directed that Pullman should contribute an 8.05% allocation share amounting to $1,873,560.08 and entered judgment in favor of the Caldwell Group for that amount against

Pullman, Rexon and Mark IV Industries,[2] jointly and severally, plus prejudgment interest and attorneys' fees.

Pullman, Rexon and Mark IV Industries have appealed, alleging numerous errors in the District Court proceedings. Pullman contends that, under the stock purchase agreement, it did not indemnify Rexon or assume its liabilities other than those existing at its own premises, that Caldwell has no right to a direct action, and that the allocation was erroneous. Morever, it is asserted that the cost of one of the remedial means used should not have been permitted, that no prejudgment interest is appropriate, and that because it had been dissolved, Rexon was not amenable to suit.

### III.

Interpretation of the retention of liabilities language in the 1989 stock purchase agreement is a critical issue in this appeal because the District Court ruled that Pullman's liability was based on a contractual obligation. Although federal law underlies the cause of action, state law applies to interpreting a contract that affects CERCLA liability. See, e.g., United States v. USX Corp., 68 F.3d 811, 826 n.30 (3d Cir. 1995); Beazer E., Inc. v. Mead Corp., 34 F.3d 206, 215 (3d Cir. 1994). Here, section 11.10 of the stock purchase agreement provides that New Jersey law applies.

Paragraph 1.05 of the agreement, captioned "[Pullman] Retention of Certain Liabilities," reads in pertinent part:

> "Anything contained herein or in any other document, instrument or agreement to the contrary notwithstanding, [Pullman] agrees to assume and become liable for, and to pay, perform and discharge and to indemnify [Rexon] and to hold [Rexon] harmless from and against any and all liabilities and obligations with respect to the following:

> * * * (c)(2) any and all liabilities and obligations (including without limitation, any liabilities or obligations to third parties for any consequential or punitive damages) arising out of or relating to . . . (B) any actual or alleged violation of

---

[2] Mark IV had assumed various liabilities of Pullman in 1996.

or non-compliance by [Rexon] with any Environmental Laws as of or prior to the Closing Date (including without limitation, Superfund liabilities or similar liabilities for other sites . . .)."[3]

Pullman concedes that there has been no dispute that Rexon's "disposal arrangements with Caldwell Trucking were of a nature or character as to give rise to an allegation of an 'actual or alleged violation of or non-compliance' by Rexon." Appellant's Brief at 60.

Under section 107 of CERCLA, 42 U.S.C. § 9607(c)(1), Rexon may not divest itself of liability for its pollution activity. See, e.g., Horsehead Indus., Inc. v. Paramount Commc'ns, Inc., 258 F.3d 132, 135 (3d Cir. 2001); Hatco Corp. v. W.R. Grace & Co. - Conn., 59 F.3d 400, 404 (3d Cir. 1995); Beazer E., Inc., 34 F.3d 210-11. Although it may not escape liability to the government, a participant in a contamination activity may secure contribution from other responsible parties or indemnification. See, Section 113 of CERCLA, 42 U.S.C. § 9613(f); Horsehead Indus., 258 F.3d at 135; New Jersey Tpk. Auth. v. PPG Indus., Inc., 197 F.3d 96, 104 (3d Cir. 1999); Hatco Corp., 59 F.3d at 404; Beazer E., Inc., 34 F.3d at 210-11.

Although its argument is not clear, Pullman appears to contend that the retention of liabilities clause would apply if Rexon paid its share of remediation expenses incurred by the state or federal governments pursuant to section 107, but not if those costs had been incurred by polluters themselves.

Paragraph 1.05 does not support such a construction because its language is far more sweeping. Subparagraph (c)(2) refers to "[a]ny and all liabilities and obligations . . . arising out of or relating to . . . (B) any actual or alleged violation of or non-compliance by [Rexon] with any Environmental Laws as of or prior to the Closing Date (including without limitation, Superfund

---

[3]

We note that the stock purchase agreement also contained a $100,000 deductible. At oral argument, the parties indicated that, depending on the outcome of the case, they could reach an agreement as to an appropriate offset against the judgment.

liabilities or similar liabilities for other sites . . .)." The text does not include a limitation applicable only to matters brought under section 107.

Pullman's concession that Rexon was a perpetrator under the terms of section 107, a conclusion that is overwhelming here, establishes that there was a breach of the environmental laws. The record demonstrates that the violations occurred before 1989, when the stock purchase agreement was signed. Indeed, the EPA had put the Caldwell property on the National Priorities List in 1983, before Pullman purchased Rexon.

As an alternative basis for exculpation, Pullman argues that the retention of liability provision applies only to contamination that Rexon inflicted on its own sites in Fairfield and Wayne and not to pollution on Caldwell's property. As Pullman states in its brief, "To the extent the parties intended to impose liability on Pullman for contribution at third party disposal sites, the language of the Agreement would have been specific." Appellant's Brief at 59.

Pullman's interpretation, however, is foreclosed by the wording in subparagraph (c)(2), which extends responsibility to "Superfund liabilities or similar liabilities for other sites . . .." The agreement's language itself is broad enough to cover all of Rexon's environmental liabilities. However, some extrinsic evidence was received.

After initial consideration of Caldwell's motion for summary judgment, the District Court ruled that the contract was "ambiguous on the amount of liability Pullman agreed to assume and the type of environmental violation that is within the purview of the parties 1989 [Stock Purchase Agreement]." It was only after hearing oral argument on the ambiguity issue that the Court granted the Caldwell motion for judgment and found Pullman directly liable. The record is opaque on whether, as both parties argue, the extrinsic evidence was a factor considered by the District Court in reaching its conclusion on liability.

In its memorandum accompanying the order for judgment, the District Court did not mention any extrinsic evidence that it might have considered in reaching its decision. However, because both parties here have raised the subject and there has been no objection to the introduction of extrinsic evidence, we will

comment on it briefly.

The deposition testimony of John C. Bennett, counsel for the Rexon purchaser in 1989, detailed the negotiations and drafting leading to the final agreement. He expressed his primary concern at that time that Pullman retain liability for all of Rexon's environmental problems as well as provide indemnity. In addition, the bank financing the purchase insisted that Pullman assume, rather than simply indemnify, Rexon for its environmental responsibilities.

The extrinsic evidence strongly supported the District Court's conclusion that the agreement covered all of Rexon's environmental liability problems. We are persuaded that the District Court did not err in construing the agreement to encompass Rexon's liability as a supplier of waste to Caldwell Trucking in addition to contamination that might exist at the Fairfield and Wayne premises.

Section 1.05 of the stock purchase agreement has a more expansive scope than a mere indemnification provision. It provides that Pullman will "assume and become liable for" and "hold [Rexon] harmless from and against any and all liabilities . . . with respect to the following: . . .."

In Bouton v. Litton Indus., Inc., 423 F.2d 643, 651 (3d Cir. 1970), we construed a contract for the sale of the assets of a business and distinguished between indemnity and assumption provisions. We observed, "one who assumes a liability, as distinguished from one who agrees to indemnify against it, takes the obligation of the transferor unto himself . . .." Id. See also Hatco Corp., 59 F.3d at 406.

The agreements in Bouton and Hatco were interpreted under New York law. See Hatco Corp., 59 F.3d at 405; Bouton, 423 F.2d at 650-51. The parties have accepted New Jersey law as applicable here, but they have not cited instances in which the law of New Jersey would vary from that of New York in differentiating between indemnity against, and assumption of, liability.

As we have explained before, "[u]nder New Jersey law, courts should interpret a contract considering 'the objective intent manifested in the language of the contract in light of the circumstances surrounding the transaction.'" SmithKline Beecham

Corp. v. Rohm & Haas Co., 89 F.3d 154, 159 (3d Cir. 1996) (quoting Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co. of Wis., 767 F.2d 43, 47 (3d Cir. 1985)). Thus, "[w]e cannot ignore the express language of the contract." SmithKline Beecham Corp., 89 F.3d at 161 (citing Commc'ns Workers of Am., Local 1087 v. Monmouth County Bd. of Soc. Servs., 476 A.2d 777, 782 (N.J. 1984)). As we pointed out earlier, the text of section 1.05 demonstrates the broad nature of Pullman's assumption.

Pullman insists that it agreed only to indemnify Rexon rather than stand in its shoes and assume the obligation. Pullman points out that, in the usual indemnity situation, the indemnitor is liable to the indemnitee only after a judgment has been entered against it, and until that has occurred, no responsibility exists. See, e.g., McGlone v. Corbi, 279 A.2d 812, 817 (N.J. 1971); Harley Davidson Motor Co., Inc. v. Advance Die Casting, Inc., 678 A.2d 293, 295 (N.J. Super. Ct. App. Div. 1996). Accordingly, Pullman argues that, as indemnitor, it cannot be sued directly.

Although Pullman is correct in its description of the two-step operation of an indemnity agreement, there is more involved here. Rexon is a party to this suit and its defense has been financed by Pullman. It is obvious, therefore, that it had notice of the claim and participated in the proceedings establishing liability on the part of both Rexon and Pullman. In effect, the two-step process that ordinarily would be accomplished by the use of third-party complaints was consolidated into one. In the circumstances of this case and its status at this juncture, we do not find that to be reversible error.

Even were we to focus entirely on the "indemnification" language, that would not change the result in this case. Pullman would still have been required to indemnify Rexon for "Superfund liabilities or similar liabilities for other sites." Under New Jersey law, ambiguities in an indemnification agreement are generally construed against the indemnitee. See SmithKline Beecham Corp., 89 F.3d at 161 n.3 (citing Ramos v. Browning Ferris Indus., 510 A.2d 1152, 1159 (N.J. 1986)). However, here, as in SmithKline Beecham Corp., "the Agreement was negotiated at arms length between the representatives of sophisticated business entities." SmithKline Beecham Corp., 89 F.3d at 161 n.3. The scope of the retained responsibilities is the

same under both theories of assumption and indemnification.

We note also that the agreement includes "hold harmless" language. See generally Fisher Dev. Corp. v. Boise Cascade Corp., 37 F.3d 104, 113 n.3 (3d Cir. 1994) (explaining that "[i]n a hold-harmless agreement, one party agrees 'to hold the other without responsibility for . . . liability arising out of the transaction involved.'") (quoting Black's Law Dictionary 731 (6th Ed. 1990)).

In Carvalho v. Toll Bros. & Developers, 675 A.2d 209, 215 (N.J. 1995), the Supreme Court of New Jersey explained that "interpretation and enforcement of hold harmless agreements should be governed by the intention of the parties in providing for insurance and the division of risk." In Eaton v. Grau, 845 A.2d 707, 712 (N.J. Super. Ct. App. Div. 2004), the Superior Court of New Jersey held that a hold harmless agreement protected "against both plaintiff's liability to third parties and actual losses sustained by her." Although the addition of the hold harmless language adds strength to the Group's position here, we need not determine if it is to be interpreted as equivalent to "assume" under New Jersey law.

## IV.

Defendants also contend that Rexon was not amenable to suit because it was "dead and buried" when the judgment was entered. This argument is based on an order in a tangentially related criminal matter, where the District Court for New Jersey on February 23, 1995 directed that Rexon dissolve itself by August 21, 1995.

As noted earlier, the suit before us was filed on April 6, 1995. Rexon was served with process in April and May 1995 and its certificate of dissolution was not filed until June 30, 1995. Pullman points out that Rexon's facilities in Wayne and Fairfield had ceased operations in September, 1994, the bank had attached the remaining assets, and by June 30, 1995 Rexon had liquidated. Consequently, Pullman argues that Rexon no longer existed.

Although defendants may be correct that by June 30, 1995 Rexon was tottering on the edge of its grave, it still had enough spark of life remaining in May 1995 to file a motion for reduction of the fine imposed in the criminal case. Moreover, Rexon was one of several plaintiffs who initiated a coverage suit

against their insurers in October 2002, years after it was allegedly "dead and buried." We conclude that the suit against Rexon was permissible. See In re: RegO Co., 623 A.2d 92 (Del. Ch. 1992). Rexon was neither dead nor buried alive and the judgment against it is valid.

## V.

The defendants also contend that the Caldwell Group is not entitled to recover because it is a third-party beneficiary excluded from recovery by the terms of the 1989 stock purchase agreement. Paragraph 11.03 of the contract reads:

> "Successors and Assigns. The terms and conditions of this agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties hereto, provided that no person, firm, or entity . . . other than the parties hereto, their respective successors and assigns shall be deemed a beneficiary of any of the representations, warranties or covenants contained herein."

The general, boilerplate language, however, must yield to the specific direction of Paragraph 1.05 that "[a]nything contained herein . . . to the contrary notwithstanding, [Pullman] agrees to assumes . . . all liabilities . . . with respect to . . . [those] arising out of or relating to . . . alleged violation[s] of . . . Environmental Laws . . . including Superfund liability . . .." Whatever doubt may exist after review of the language in the contract was resolved by the extrinsic evidence that made clear the parties' intention to have Pullman assume all of Rexon's environmental liabilities.

## VI.

The dispute over the interpretation of the contract is focused on the conflict between two parties, but the damages aspect of the case is far more diffuse. The number of defendants from whom contribution was sought exceeded one hundred. This aggregation included entities and individuals who had supplied

substantial contaminates as well as those who had contributed little or none.

Early in the litigation, the District Court approved an intensive alternative dispute resolution process including mediation as a way to apportion responsibility. As a result, large numbers of claims amounting to about 20% of the total damages were settled. In the instance of the Carborundum Company, a major polluter, the parties stipulated its share of responsibility at approximately 20%.

Allocation of responsibility for contamination at a site where numerous entities contribute various amounts and various degrees of concentration of waste over various periods of time is an obviously difficult task. In this case, both parties produced expert testimony. Based on evaluation of the witnesses' presentation and the available data, the District Court concluded that the evidence offered by the Caldwell Group was more persuasive.

Caldwell's presentation considered the beginning point to be 60% of the total damages after eliminating the 20% allocated to Carborundum Company and the 20% attributed to settled claims. Rexon contends that the base point should have been the total amount of waste received by the Trucking Company. The District Court accepted the 60% solution as reasonable under the circumstances. We do not differ with that assessment.

During the latter period of Rexon's operations, its waste was deposited by Caldwell Trucking into tanks on its property instead of the lagoons, and following that to ocean dumping facilities. Rexon argues that it should not have been charged for any contamination once these changes in disposal occurred. The Group, however, explains that in transferring Rexon's waste to tanks on the Caldwell Trucking property, some spillage occurred, albeit unintended. To some extent based on evidence of individuals who did the actual transportation, the District Court took these factors into account and assessed only 10% of that waste volume to the calculation.

Rexon also takes issue with the costs of an iron reactive barrier installed by the Caldwell Group in lieu of the pump and treatment method recommended by the EPA. It appears from the evidence that the iron reactive barrier method cost substantially less and proved effective in coping with ground water pollution.

Moreover, the EPA was content to delay application of its suggested pump and treatment method pending evaluation of the iron reactive barrier method.

Pullman also argues that Caldwell was not entitled to recover the cost of the iron reactive barrier because this remedial action did not substantially comply with the National Contingency Plan. Section 107(a)(4)(B) of CERCLA specifies that a remedy must be "consistent with the national contingency plan" in order for its cost to be recoverable. 42 U.S.C. § 9607(a)(4)(B).

Pullman contends that "[a]t trial, plaintiffs did not demonstrate that the installation of the iron reactive wall was anything more than an experimental remedy not adopted by the EPA in its Record of Decision." Appellant's Brief at 85. Hence, Pullman asserts that the remedial action failed to substantially comply with the National Contingency Plan. However, Pullman fails to provide any significant evidence of an inconsistency with the National Contingency Plan beyond the status of the iron reactive barrier as an "experimental" remedy that the EPA had not included in its Record of Decision.

In contrast, the District Court carefully documented the remedy's compliance with both the National Contingency Plan and the Consent Decree. Perhaps most importantly, in its opinion, the District Court noted that "[t]he EPA has consented to all work performed at the Site and has never objected to any of the work performed by [Caldwell]." Furthermore, the iron reactive barrier was more cost effective and had performed more effectively than the pump and treat remedy was expected to perform. As did the District Court, we conclude that the iron reactive barrier is consistent with the National Contingency Plan and the cost is a proper item of damages.

Rexon objected to other computations in the Caldwell allocation, but we conclude that they were adequately considered by the District Court. The records over a period of many years were not available to document precisely the many variables that would have been the basis for a calculation. Put another way, the Caldwell evidence established an equitable allocation that was reasonable under all the circumstances.

The District Court assessed prejudgment interest against Rexon. It does not dispute the calculations nor the total

amount of this item, but maintains that no interest whatsoever should be awarded.

The action was brought under section 113(f), which provides for contribution from persons liable under section 107 as liable or potentially liable. Section 107 mandates imposition of prejudgment interest. Section 113 is silent on that point and its lack of direction fairly leads to an interpretation that, in contribution cases, such an award is discretionary or generally controlled by common law.

In Bancamerica Commercial Corp. v. Mosher Steel of Kan., Inc., 100 F.3d 792 (10th Cir. 1996), the Court directed that prejudgment interest be awarded in a section 113 case. See also United States v. Consolidation Coal Co., 345 F.3d 409 (6th Cir. 2003). A number of district courts have followed that procedure as well. See, e.g., Allied-Signal, Inc. v. Amcast Int'l Corp., 177 F. Supp. 2d. 713, 758 (S.D. Ohio 2001).

The argument for awarding prejudgment interest lies in the view that when a plaintiff has been denied the use of an ascertainable amount of money for a period of time, there is an actual loss. Section 107 specifically recognizes the loss and we can perceive no reason to deny recovery when the action is brought under section 113.

Accordingly, we conclude that prejudgment interest may be awarded under section 113, although it is not mandatory.

The Judgment of the District Court will be affirmed.

_____